225 F.2d 427
 Bernard Mitchell WOLFE and Frederick J. Dannenfelser,
Individuals and Co-Partners Doing Business Under
the Name and Styles, 'Dutch Paint Co.'
and 'Manning-Mitchell Paint
Co.,' Appellants,
v.
NATIONAL LEAD COMPANY, a New Jersey Corporation; E. I. du
Pont de Nemours and Company, Inc., et al., Appellees.
 No. 13966.
 United States Court of Appeals Ninth Circuit.
 June 27, 1955.
Rehearing Denied Aug. 22, 1955.
 
 Joseph L. Alioto, Maxwell Keith, San Francisco, Cal., for appellants.
 Robert E. Burns, Crimmins, Kent, Draper & Bradley, San Francisco, Cal. (James D. Ewing, Milton Handler, John B. Henrich, Eugene Z. DuBose, Stanley D. Robinson, New York City, of counsel), for appellee Nat. Lead Co.
 Eugene D. Bennett, Francis R. Kirkham, James Michael, San Francisco, Cal. (James P. Kranz, Jr., New York City, Pillsbury, Madion & Sutro, San Francisco, Cal., of counsel), for appellee E. I. du Pont.
 Before DENMAN, Chief Judge, and HEALY and McALLISTER, Circuit Judges.
 McALLISTER, Circuit Judge.
 
 
 1
 This is an appeal from a decree dismissing a private action brought under the antitrust act, and based upon the claim that appellants suffered damage as the result of appellees' conspiracy to restrain trade and to fix prices.
 
 
 2
 The background of the controversy is as follows: After World War II, the government instituted certain programs designed to help returning veterans get started in business. To the Civilian Production Administration was confided general charge of the plan for allocation of scarce materials to such veterans during the years of post-war shortages. With respect to veterans who desired to enter the paint manufacturing business, the above Administration had charge of planning the allocation of titanium pigment, a product made from ilmenite ore, and used in the manufacture of paints, paper, rubber, ceramics, and other products. By far the largest producers of titanium pigment in the United States are appellees, E. I. du Pont de Nemours and Company and the National Lead Company.
 
 
 3
 Having ascertained that the supply of titanium pigment was in 1946 substantially below minimum requirements, and that the shortage was so serious as to threaten the increased production of peacetime products, the Civilian Production Administration called a joint meeting in February of its Industry Advisory Committee for the titanium pigment and zinc sulphide industries. At this meeting, there was established a veterans' quota program in which it was determined that the industries involved should be required to furnish assured minimum quotas to bona fide veterans entering the paint business.
 
 
 4
 The evidence discloses that during the years 1947 and 1948, the scarcity of titanium which was under consideration by the Civilian Production Administration in 1946 continued and, in conformity with the program above mentioned, the producers, including appellee companies, allocated the product manufactured by them to the different paint manufacturers, including veterans who were engaging in the business for the first time.
 
 
 5
 Among these veterans who were commencing the paint manufacturing business were appellants and their associates who entered the industry in 1946. They had launched their enterprise with an initial capital contribution of $10,000. Within a space of four years, their business had a net worth of $132,000 and, within that time, it had yielded total profits of $392,000, of which $262,000 was paid to them in salaries, bonuses, and partners' drawings, and of which $23,000 was paid out in dividends.
 
 
 6
 However, in spite of their successful operations, appellants claimed to be injured by the wrongful conduct on the part of appellee companies who were supplying them with titanium. This conduct, they say, consisted of a conspiracy on the part of appellees, who control the sale and distribution of titanium in the United States, to restrict appellants to a fixed and arbitrary supply of titanium and to fix the prices in violation of the Sherman Act, 15 U.S.C.A. §§ 1-8, 15 note; and they alleged that they suffered great injury as a result of such conspiracy. Accordingly, they brought a private antitrust action against appellees under the provisions of the Clayton Act, 15 U.S.C.A. § 12 et seq., for an injunction and for the recovery of treble damages.
 
 
 7
 On the trial, the district court, without passing upon the question whether there was proof of a conspiracy, granted appellees' motion to dismiss, on the ground that after an extended hearing in which many witnesses testified and numerous exhibits were introduced in evidence, there was no proof that appellants had suffered injury from any acts or alleged acts of appellees.
 
 
 8
 On review, appellants contend that they were discriminated against by the allocation of titanium made to them which was a result of conspiracy in restraint of trade. It appears that 1947 and 1948 were years of scarcity during which titanium was allocated to appellants according to a quota. In 1949, there was no longer any shortage of the product and appellants could secure all the titanium they wanted.
 
 
 9
 The record shows that appellants' net income in each of the three years above mentioned was as follows:
 
 
 10
 1947 1948 1949
----------- ----------- ----------
$102,671.60 $154,393.78 $81,784.46
 
 
 11
 It will be seen from the above that appellants' net profits were much greater in the years 1947 and 1948 when the allocation of titanium was made to them under quota because of scarcity than in 1949 when they could get all the titanium they wanted. In other words, the peak years of appellants' business success were during the time they claimed to be damaged by appellees' conspiracy. Yet the first year in which they could buy the titanium without restriction, in 1949, their net income dropped and was much less than during the restricted years.
 
 
 12
 It would seem that if appellants had conducted a more profitable business during the period of scarcity than they did in the subsequent year in which there was no scarcity, they would not have been injured by the shortage or by the allocations made to them. The district court expressed itself as curious as to how appellants were injured by reason of the allocation to them of the scarce materials, when they were making much greater profits during that period than they were making immediately afterward at a time when they could get all the material they desired. Appellants' explanation why they were making greater profits in the years of shortages and quotas was as follows: 'During the years of the shortage,' appellants' counsel explained to the court, 'because they did not have the titanium pigment to make all the paints that the National Lead was making, that du Pont was making, they had to engage in a lot of special business, that is, the purchase of surplus and the remanufacture of purchased surplus products, and a resale of those products, and that is where their profits came from. It did not come from titanium pigments.' Counsel thus accounts for appellants' phenomenal success during the years of post-war scarcity, but by what he would appear to consider a rag-tag dealing in odds and ends, and attributes no profit to the very large business they carried on in the manufacture and sale of titanium paint. Accordingly, appellants, in effect, ask the court to disregard the apparent probative effect of their net profit figures for the three years in question, and to consider only that portion of their business related to titanium pigments, and in this, they seek to have the court isolate the titanium pigment portion of their business and consider it separate and apart from their other operations. In this way, they attempt to establish the fact that they received a higher return on the titanium pigment which they were able to secure in 1949 than upon that which they were able to secure in 1947 and 1948. The claim of appellants that they earned more profits on titanium in 1949 than in each of the two preceding years-- and thus were injured by the alleged conspiracy-- is based upon what they call their 'gross profit on materials handled.' This 'gross profit' is merely their gross sales less their total purchases. They estimate that the manufactured items containing titanium constituted 42% of their gross sales in 1947, 58% in 1948, and 76% in 1949. They then apply these percentages to their total 'gross profit' in those years, and, as a result, show a larger 'gross profit' on this part of their business in the year 1949.
 
 
 13
 Appellants' 'gross profit on materials handled' has no probative value. It does not even represent true gross profit. All cost except cost of merchandise sold, is eliminated, including labor, depreciation, maintenance, repairs, and all the other expenses of doing business. The fact that appellants' 'gross profits'-- or even net profits-- on titanium paint might have increased during the so-called free period of 1949 is not, without taking into consideration other factors in their business operations, proof that they were damaged by the allocation of quotas during the shortage period. If they abandoned or curtailed other lines of production in order to concentrate their efforts and the use of their facilities on titanium paint after the period of shortages, the result would give a completely distorted picture. For the profit in one line of business might have increased only at the expense of the other, rather than because of the abolition of the restricted quotas. The claimed injury of appellants cannot be arrived at by considering the growth of one line of business without making allowance for the diminution of the other. It thus appears that there was no real comparison made by appellants between their operations in 1949 and those in the preceding years. For a multitude of factors was missing which might have accounted for the difference in their profits, not the least being different costs of operations for the different periods, as well as the abandonment or curtailment of certain operations in some years in favor of others for different years.
 
 
 14
 In any event, 'gross profits' for the various years is no criterion of injury in this case. For the only way of ascertaining whether the business was more profitable in one year than another is by comparing the net profits for one year with another-- and this would apply even were only the titanium paint operations considered. Appellants' use of so-called 'gross profit on materials handled' has no probative value in proving injury claimed to have been suffered by the conduct of appellees. 'The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.' Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544.
 
 
 15
 Appellants refer to Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 266, 66 S.Ct. 574, 580, 90 L.Ed. 652, in support of their claim that a comparison of their operations for the different years in the manner above outlined constituted proof of injury and damages. In the Bigelow case, petitioners owned a moving picture theatre in Chicago. Some of the respondents were distributors of films; others owned or controlled theatres. Petitioners charged that by reason of an unlawful conspiracy, they were prevented from receiving pictures for exhibition until after preferred exhibitors had been able to show them in earlier and more desirable runs, and that petitioners were thus discriminated against in the distribution of feature films, in favor of competing theatres owned or controlled by respondents. It appears that after the introduction, in 1937, of the practice of showing double features, petitioners were no longer able to secure films which had not had a prior showing; and they charged that, as a result of respondents' unlawful acts, they had suffered a loss of earnings during a five-year period subsequent thereto. To establish their damage, they introduced two classes of evidence. The first was a comparison of earnings during the above mentioned five-year period, of petitioners' theatre, with those of a comparable theatre of respondents, which showed a difference of $116,000 in favor of the latter. The second class of evidence was a comparison of the receipts of petitioners' theatre for the five years following 1937, with the receipts for four years immediately preceding, which showed a decline aggregating more than $125,000. The jury returned a verdict of $120,000, which was trebled by the court. On review, the Supreme Court held the evidence sufficient to sustain the verdict, saying: 'The evidence here was ample to support a just and reasonable inference that petitioners were damaged by respondents' action, whose unlawfulness the jury has found, and respondents do not challenge. The comparison of petitioners' receipts before and after respondents' unlawful action impinged on petitioners' business afforded a sufficient basis for the jury's computation of the damage, where the respondents' wrongful action had prevented petitioners from making any more precise proof of the amount of the damage.'
 
 
 16
 We are of the view that the Bigelow case is completely inapplicable to the facts in the controversy before us, and that the district court correctly distinguished the case on two grounds: that the evidence in that case established the fact of damage; and that there was relevant data and a proper basis upon which the estimate of the amount of damages could be supported, which was not the fact in he present controversy. In the Bigelow case, it was a comparatively simple problem to estimate probable profits. As said of a similar situation, involving damages for inability to obtain first-run pictures, in William Goldman Theatres, Inc., v. Loew's, Inc., D.C.Pa., 69 F.Supp. 103, 107, affirmed 3 Cir., 164 F.2d 1021, the court stated: 'With this background to start with, we must determine whether the evidence in the case is sufficient to supply a basis for estimating probable profits with the degree of accuracy which the law requires. * * * In dealing with the question, it should be kept in mind that the motion picture business is in many respects unique. Certainly, the problem of estimating its probable return is very different from that presented in the case of a manufacturing business. In a sense, it is much simpler.' The court then went on to particularize: 'Of the three major factors, cost, prices and volume, the first two can be predicted with very much greater accuracy than in the ordinary industry or business. As to costs, rental is usually fixed or ascertainable, wages and salaries do not constitute a major part of operating costs and items like advertising service, electricity, maintenance and repair are within limits ascertainable. Film rental, the largest factor in costs, is usually on a percentage basis and consequently bears a constant ratio to receipts. At any rate, in the present case, the parties are in substantial agreement as to what would have been the cost of operating the Erlanger during the damage period. As to prices, wide and unpredictable fluctuations need not be expected, and in the present case the evidence shows that the charges for admissions at the first-run theatres during the damage period were quite stable.' The instant case, dealing with a manufacturing business, is so completely different from the motion picture business with regard to estimating its probable return that the rule used in the latter cases is completely inapplicable to a manufacturing business.
 
 
 17
 In the light of the circumstances heretofore discussed, the Bigelow case is, in our view, no guide in the case before us.
 
 
 18
 Moreover, aside from the fact that the method of gross profits used by appellants is not a criterion of injury in this case, appellants are foreclosed from recovery because of other considerations. In the first place, they assume that they would have received larger quantities of titanium except for the alleged conspiracy; but there is no evidence that they would have, or that they were entitled to larger quantities than they actually received. They further assume, without proof, that the conditions of supply and demand in titanium pigments were the same in 1949 as in preceding years; and they likewise assume, without evidence, that the market conditions for paints were the same. In addition, there is no evidence that they would have manufactured and sold more paint in 1947 and 1948 if they had received greater amounts of titanium pigment. It appears that other pigments could be, and were, used as substitutes for titanium; and appellants admitted that they were able to get all of the ingredients to manufacture paint that they needed except titanium pigments. In fact, they purchased immense quantities of one of such substitutes, lithopone, in 1948, buying 403,050 pounds of it in that year. They could not have been injured by their failure to secure all the titanium pigment they wanted, if they were able to obtain all they could use of a substitute in the form of lithopone. It is true that appellants claim that lithopone was not a fair equivalent of titanium pigment as it cost considerably more; and it appears that they paid $18,400 more for it during the period in controversy than they would have spent for a comparable quantity of titanium pigment. However, if they passed this extra cost on to their customers, it would not result in any reduction in their profit; and there is no evidence that they did not pass it on. It is to be said that appellants also contend that the quality of their paint was lowered by the necessity of using lithopone rather than titanium; but there is no proof that they failed to sell any part of their paint production at a profit. Their great financial success during the years of shortages when they were using the large quantities of lithopone in their paints indicates the contrary. This is, in all probability, accounted for by the fact that, in the period of shortage, the public wanted the paint at appellants' price, whether it was made with titanium or lithopone.
 
 
 19
 As to the claimed price fixing conspiracy, there is no proof that appellants sustained any injury as a result of appellees' conduct or alleged conduct. Even assuming that appellees were engaged in such a conspiracy, there is no evidence that prices were fixed at a higher level than would have been the competitive price, in the absence of price fixing, and that they were damaged by paying the higher prices, and lacking such evidence, there would be no proof of injury. Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183. If appellants did not absorb such increase in price but passed it on to their customers, they could not recover in a treble damage action brought under the antitrust act. Twin Ports Oil Co. v. Pure Oil Co., 9 Cir., 119 F.2d 747, certiorari denied 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516. In Northwestern Oil Co. v. Socony-Vacuum Oil Co., 7 Cir., 138 F.2d 967, 971, certiorari denied 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081, where, in a treble damage action brought by a jobber of gasoline based on a conspiracy to raise the tank car price of gasoline, the trial court had directed a verdict for defendant on the ground that there was no proof of injury to plaintiff, Judge Lindley, speaking for the Court of Appeals in affirming the district court, said that '* * * the Clayton Act does not permit recovery by plaintiff in causes such as this for unlawful prices as such but authorizes recovery only of pecuniary loss to property or business. * * * Inasmuch as plaintiff has wholly failed to prove any loss to its property or business but rather has shown, by all reasonable inferences, that the increased cost of which it complained was passed on to the ultimate consumer, the court rightfully directed a verdict for defendant.' 'It has now been settled in the so-called treble damage oil cases, arising out of the conspiracy referred to, that a jobber of gasoline is not entitled to recover damages merely because there has been an increase in price of the gasoline bought as the result of the conspiracy, but he must affirmatively establish a pecuniary loss to his business and property by reason of such excessive payments. * * * Clearly, where the person who has paid an excessive price has been able to pass on the increased cost to the ultimate consumer, he cannot recover.' Clark Oil Co. v. Phillips Petroleum Co., D.C.Minn., 56 F.Supp. 569, 572, 574, affirmed, 8 Cir., 148 F.2d 580, certiorari denied 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437.
 
 
 20
 An examination of the contentions advanced by appellants that they could not have passed on the increased costs to their customers is unconvincing.
 
 
 21
 The district court, in dismissing the case on the ground that appellants had failed to show any injury from the conduct of appellees, observed that the years of shortage, 1947 and 1948, had been a profitable period in the business of appellants; and that in the year 1949, in a period of non-shortage, when there was an abundance of material, the appellants conducted a less profitable business, and with this background, proceeded to analyze the complicated claims of appellants. It observed that in attempting to establish that they were injured by appellees, appellants had sought to use the proofs of the amount of material purchased by them in 1949 as a gauge to evidence the fact that if they had had more of that material in the years in which it was short, they would have been able to make more profit during that period. The court then commented upon the fact that the evidence showed the appellants to have been newcomers to the industry; that all who had participated therein, with varying exceptions, had been limited in their supplies during the period of shortage; that appellants had received their share of a short material and conducted a prosperous business from the beginning, and thereby had received a benefit in a competitive industry that they might never have received had they entered it in a period of unlimited supply and free competition; that these circumstances were illustrative, in part, of the completely speculative nature of the evidence as to any hurt or damage claimed to have been suffered; and that to submit the case to the jury would, in its opinion, be to give judicial blessing to a decision based upon speculation, surmise, and conjecture.
 
 
 22
 We concur in the views which were expressed by the trial court in dismissing the case. Appellants failed to prove injury resulting from the conduct of appellees.
 
 
 23
 The judgment of the district court is affirmed.