Craig SIEGFRIED, as a sole proprietor, and Craig Siegfried, Cedric Siegfried, Charles M. Siegfried and Frank E. Fowler, d/b/a The Blue Valley Company, a partnership, Plaintiffs,

v.

KANSAS CITY STAR COMPANY, a corporation, and Emil A. Sees, Defendants.

No. 11462.

United States District Court
W. D. Missouri, W. D.
March 1, 1961.

Ray D. Jones, Jr., Carrol C. Kennett, Kansas City, Mo., for plaintiffs.

Watson, Ess, Marshall & Enggas, Carl E. Enggas, Colvin A. Peterson, Jr., Kansas City, Mo., for defendants.

RIDGE, Chief Judge.

In response to the order entered herein on December 16, 1960, the parties have filed motions "as to what form of judgment, if any, should be entered on the verdict of the jury as returned at the trial" of this case on December 8, 1960.

I have had an opportunity to review the transcripts of proceedings as made at the eleven (11) pre-trial conferences held herein, (944 pages); the partial transcript of testimony adduced at the trial; and notes made during both those cycles of this litigation. No useful purpose can be served by elucidating the study-time given thereto. It is sufficient to say that throughout the three-year course of this litigation the Court, at pre-trial and numerous informal conferences with counsel, undertook to crystallize the contested issues which, under the law, ultimately had to be submitted to the jury for determination; and counsel for these parties are fully aware of that fact. During the course of that procedure counsel were given full opportunity to develop and test their respective theories of claim and defense. Full discovery, by way of depositions, interrogatories, production of documents, examination of books and records, requests for admissions of fact; and access to the complete record compiled in the antecedent criminal action, including exhibits and transcript of the testimony and other proceedings had in that litigation, was made available to counsel. If the record in this case attests to anything, it attests to the plain, clear and unqualified fact that this Court has done everything in its power to give plaintiffs and defendants every possible opportunity to marshal all evidence available to them in support of their respective theories of claim and defense for submission to the jury empaneled in this action.

From the outset of such pre-trial process it was evident to this Court that defendants in all probability would not contest the issue of monopoly and attempt to monopolize, as raised by the pleadings in this case. An examination of the pre-trial record will convince any impartial mind of that fact; and, that such was patently apparent, for certainty, at least four (4) months before the commencement of the trial of this case on its merits. For instance, in brief filed with the Court as early as January, 1960, defendants' counsel stated:

"Our position with respect to proof of quantum of damages is that the evidence tendered by plaintiff to date, as outlined by various documents filed with the Court and as contained in various exhibits prepared by plaintiff, is so speculative and conjectural as to be inadmissible herein." (Br. 1/20/60, p. 55.)

At the pre-trial conference held on August 15, 1960 (Tr. 879) the following statement appears of record:

"The Court: Let the record show that counsel for the defendant has just stated to the court that the main thrust of defense is going to be on the question of damages; that the plaintiff has established no damage by reason of the monopoly or attempt to monoplize claimed."

Such is indicative of the whole background record made at the pre-trial conferences in preparing this case for trial on its merits. As a consequence, the chief endeavor of this Court for three years has been directed to developing issues as to evidentiary matter that would be adduced at the trial of this case, relating to the impact of the monopoly and attempt to monopolize as charged by plaintiffs on their respective business operations; and, the development and formulation of issues in respect to evidence as to the quantum of damages that might have been sustained by the plaintiffs as a proximate result thereof.

It is apparent from the record herein that since the time the first pre-trial conference was held plaintiffs' counsel have demonstrated much uncertainty of mind regarding the proof sufficient to establish the quantum of damages allegedly sustained by the plaintiffs. Many hours have been consumed by court and counsel in trying to resolve that matter, and in sounding out alternative and contradictory theories of claim for damages as proffered by the plaintiffs in this case. I am content to let the pre-trial transcript on file in this case speak for itself concerning this subject.

■ The matter now before the Court for determination boils down to this:

(1) On the record before the Court, should a trial *de novo* be granted to plaintiffs because the jury found that the plaintiffs' claim for damages by way of depreciated advertising revenue, was "speculative"; or should another trial be granted confined solely to the issue of damages allegedly sustained from that source, in the light of the verdict as returned by the jury?

If not:

(2) What legal judgment is indicated and should now be entered on the verdict of the jury so returned, considered in the light of the record here made?

Counsel for the parties have filed suggestions in support of motions addressed to the above propositions; fortifying the same by reference to numerous opinions rendered in previous anti-trust litigation which they contend are legally controlling of the action now to be taken by the Court. It is not necessary to here unravel the convoluted manner in which they apply such citations to the propositions supra. It should be noted, however, that the authorities cited, for the most part, have previously been considered by this Court; the rule of law as therein declared considered and discussed between court and counsel at pre-trial conferences; and, as counsel for plaintiffs state, this Court is very conscious of the fact that "In this, or any, anti-trust case counsel for both sides can find statements in these and other cases to support their argument."

■■ Tersely stated, the applicable law cited, to the matter now before the Court for decision makes clear the following axioms: that in a private anti-trust action, as in all other litigation, each case must stand or fall on its own particular facts; and, that it is a fundamental rule of law in anti-trust litigation, where the fact of injury has been shown to exist in violation of the anti-trust laws of the United States, the Courts

have, with great liberality, sustained any reasonable amount of damages assessed by a jury, where the record reveals any competent evidence to sustain the amount of damages so assessed. There can and should be no confusion in the mind of anyone concerning those propositions.

The flusteration here, if any exists, is not as to the state of applicable law, but the status of the record as made by the plaintiffs in this case, to sustain the burden of proof which the law casts upon them in this private anti-trust litigation to prove the amount of damages. "You can't go to a book and find the answer" to that problem. Cape Cod Food Products v. National Cranberry Ass'n, D.C., 119 F.Supp. 900, 910.

Shred of all superfluity, by the jury verdict returned herein, a die has been cast which molds the following ultimate facts once at issue as having been finally adjudicated: (1) During the period from January 7, 1950, through December 12, 1957, the defendant The Kansas City Star Company possessed monopoly power which it used to control and dominate interstate trade and commerce in the dissemination of news and advertising; (2) and, with Emil A. Sees, it attempted to monopolize the dissemination of news and advertising in the metropolitan area of Kansas City, Missouri, as a consequence of such power; (3) such monopoly, and attempt to monopolize, were a proximate cause of injury to the plaintiffs in their operation of The Pictorial Shopper; The Independence Daily News; and Radio Station KIMO; (4) however, such monopoly power and attempt to monopolize did not substantially reduce and retard the circulation of either The Independence Daily News, or The Pictorial Shopper; (5) but did substantially reduce and retard the advertising revenue of both of those publications, as well as that of Radio Station KIMO; (6) however, the amount thereof, measured in dollars and cents, was "speculative." ("Substantially" as above used is synonymous with "materially.")

Hence the only matter now for consideration by this Court is reduced to a single proposition which is wholly related to the evidence adduced by plaintiffs to sustain the burden of proof which the law casts upon them in this case, to prove the amount of damages which they allegedly sustained as a proximate result of defendants' adjudicated violations of Section 2 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 2. As to that proposition, it is well settled case law that "juries are allowed to act upon probable and inferential, as well as direct and positive, proof," in ascertaining the amount of damages sustained by one whose business has been subject to the conduct of another in violation of the anti-trust laws of the United States. As said by the Supreme Court of the United States, in Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652:

> "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. * * * That principle is an ancient one, * * * and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application * * *." 327 U.S. loc. cit. 265, 66 S.Ct. loc. cit. 580.

But it must not be overlooked that the Court further said:

> "In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may *not* render a verdict based on speculation or guesswork." 327 U.S. 264, 66 S.Ct. 579.

As above noted, the only issue not definitely and finally resolved by the jury verdict as returned is as to the amount of "advertising revenue" that was proximately "depreciated and retarded" which plaintiffs otherwise might have obtained, but for the monopoly and attempt to monopolize here adjudicated. That, legally boiled down, relates to a claim for "loss of anticipated profits."

Proof Offered by Plaintiffs as to KIMO's Loss of Anticipated Advertising Profits:

This is what plaintiffs proffered to the jury for its consideration in respect to that single issue, as to KIMO Radio.

In the testimony of Mr. Tom Evans to the effect that when the radio logs of KCMO Radio Station were not published in the radio section of The Kansas City Star, that station (operated by him during the years 1934 to 1938) sustained a loss; after 1938, when KCMO's log was published in the radio section of The Star, and KCMO had increased its power, and secured a national hook-up, which added to its income, KCMO operated at a profit. The listing of a radio log in The Star adds listening public to a radio station. (Evans, Depo.)

There was testimony to the effect that representatives of KIMO, from the year 1947 through 1953, contacted the Radio Editors of The Kansas City Star, Mr. Sees, and other officers of The Star, in an endeavor to get KIMO's log published in the radio section of The Star; they were first informed of a policy adopted by The Star in 1947, about the time KIMO went on the air, whereby only radio stations having studios in Kansas City, Missouri, would be published, without charge, in the radio section of The Star; KIMO made arrangements with Damon Recording Studios, in Kansas City, Missouri, to pipe programs to KIMO's Broadcasting Station, in Independence, Missouri; but, notwithstanding, KIMO did not get its log published in The Star. Representatives of KIMO made a number of inquiries of officers of The Star, and offered to purchase space on the radio page of The Star each evening and Sunday, and sign a contract for such space for a period of one (1) year at the lowest contract rate offered by defendants to any advertiser for such frequent insertion of its radio log. The testimony was, that the only rates quoted to plaintiffs for the insertion of KIMO's log on the radio page, as paid advertisement, were the general or forced combination rates then in effect, together with position charges

to insure the log would appear on the radio page. This, plaintiffs could not afford and did not pay. Defendant Sees testified that The Star did not usually and customarily exact a position charge from any advertisers for position of an ad in The Star papers, except when a specific position was demanded. Space on the radio page of The Star has a value to a radio station. Craig Siegfried testified he was willing to pay at least the lowest rate charged any advertiser for the space necessary to have KIMO's radio log published in that section of The Star. Such advertising space was calculated by him at approximately $10,000 per year, which KIMO never did pay. There is no evidence in this record as to the cost of any ads. actually placed by KIMO and published in The Star.

KIMO received less than one percent (1%) of national advertising. Such advertising is an important source of revenue. KIMO attributes its impotency to sell that class, and other classes, of advertising to its inability to have its radio logs published in The Star.

Exhibits were admitted in evidence (Exs. 27, 29 & 30) as to the gross revenues of KIMO; its income and expense from 1953 to 1957; and what would have been the cost to KIMO had it placed a 5-inch log ad. in The Star under varying rates established by defendants. (Exs. 84, 85, 86.)

Craig Siegfried gave testimony as to the historical background and year-to-year gross revenue and costs of operation of KIMO from 1947 to 1958, when KIMO was sold to other interests. He expressed the opinion that the advertising revenue of KIMO was reduced because of its inability to get its radio log published in the radio section of The Star, on the same basis as logs of other radio stations were so published.

The salient point to be understood here and stated regarding all testimony adduced at the trial relating to damages allegedly sustained by KIMO, is that the record as made is absolutely devoid of any evidence as to the quantum of damage, by proof of estimated loss of

net profits which KIMO could or might have received but for the monopoly and attempt to monopolize adjudicated by the jury verdict as returned. This is made crystal clear, because the only matter that counsel for plaintiffs relates to the quantum of damages sustained by KIMO, in the suggestions filed in support of their motion now before the Court, is stated thus:

"Plaintiffs have been discriminated against and damaged in the amount of at least the value of that newspaper space (KIMO could have purchased) at the lowest rate to any advertiser." (p. 13.)

Note, they do not state KIMO actually paid an exorbitant rate, or other rate, for advertising in The Star. Of course, if KIMO had been charged and had paid a discriminatory rate for advertising in The Star, that would have been an item for consideration in assessing KIMO's measure of damage. But when it is conceded, as it must be here, that KIMO did not pay any such advertising rate, the only amount of damage that could legally be assessed for failure to publish KIMO's log in The Star, must relate that conduct to a claim for "loss of anticipated profits."

In their supplemental suggestions filed January 25, 1961, counsel for the plaintiffs state the quantum of damages sustained by KIMO thus:

"As to KIMO, its income, expenses and profits are in evidence, and their accuracy was not questioned by the defendants." (Standing alone, that proves nothing.) Par. added.

"Plaintiffs' exhibits showed that the metropolitan area stations as a group, and these group figures include KIMO's figures, obtained more than forty percent of their revenue from national spot advertisers in each year. Less than one percent of KIMO's revenue came from such advertising." (The exhibits were based on gross revenue received by all radio stations in the metropolitan area.) Par. added.

"Mr. Siegfried testified that not being in the paper made it next to impossible to get national advertising in competition with stations that were in the paper.

"The evidence shows that in 1951 and 1952, KCKN obtained more than three times the revenue of KIMO. KCKN had one-fourth the power of KIMO, but did broadcast at night. Did the night broadcasts make that much difference?" (Again, this was related to gross revenue of KCKN.) Par. added.

"Defendants say KIMO was not comparable to the other stations. Plaintiffs submit that the likes of all these stations are much greater than their dislikes. They all broadcast a signal that could be heard throughout the metropolitan area, with the exception of KCKN, whose signal could not be heard throughout all of the area; they all broadcast news, features and entertainment; they all depended upon advertising income for their livelihood. * * * And all of these stations, including KIMO, performed the same basic function—disseminating news, information and entertainment by means of a broadcast signal." (This is generally true as to all radio stations in this country.) Par. added.

"Plaintiffs submit that from all this evidence the jurors could infer substantial damage to KIMO and could have made a sensible and reasonable estimate of the amount. They had the sense and the judgment to take into account and weigh the competitive position of KIMO in relation to the other station—to take into account the facilities and power of KIMO and the other stations and estimate the profits KIMO would have made had the knowledge of KIMO's existence in the market not been suppressed by

these defendants." (A similar contention was rejected in Elyria, Loraine Broadcasting Co. v. Lorain Journal Co. (S.D.Ohio) and as hereafter demonstrated, loss of anticipated profits of an individual business cannot be so measured.) Par. added.

"Plaintiffs further submit that they were entitled to have the jury assess damages to KIMO because of the discriminatory advantages given to the other stations measured by the value to those stations of the discrimination. (Plaintiff's damage must be different from that suffered by the general public — i. e. it must be special to plaintiff. Maltz v. Sax, 7 Cir., 134 F.(2d) 2.) An offer to sell at a price the prospective purchaser cannot possibly afford to pay is no offer at all when the same service is sold to a competitor at a lower price, or, as in this case, furnished at no cost to the competitor. The only offer ever made to KIMO by these defendants for the regular publication of KIMO's log was so exorbitant that it was an outright refusal to sell. KIMO's offer to pay what the department stores pay was outright refused." Par. added.

The statements above made by way of briefs filed, are a tersely stated version of the whole summation made by counsel for plaintiffs in their closing arguments before the jury in this case. (See transcript, closing arguments, on file.) Counsel for plaintiffs ignore the fact that the exhibits as to revenue received by other radio stations was only established as to "gross income," not "net earnings." They ignore the fact that there is no evidence in this record by way of exhibit, expert testimony, or otherwise, relating the net earnings of any radio station, whose log was published in The Star, with a comparison of "net earnings" actually received by KIMO, to fix a premise for a claimed loss of anticipated profits. "Facts do not cease to exist because they are ignored."

■ The loosest construction to be given to the anti-trust laws requires a plaintiff in a private anti-trust action to bear the burden of proving the defendant's unlawful acts and that such acts were either a cause of a specific fraction of his losses, or at any rate a more substantial cause of his losses than any other known factor. Therefore, in addition to establishing that the defendants violated the anti-trust laws, the plaintiffs in this case were required to prove that the defendants' violation was the most probable proximate cause of injury to KIMO, and prove the amount of that injury. It could not be proved by merely assuming the jury knew that radio stations, as private enterprises, were intended to be operated at a profit.

Proof as to the Pictorial Shopper and
The Independence Daily News'
Loss of Advertising:

The inquiry into that matter is likewise reduced to a single consideration of anticipated profits Craig Siegfried might and should have realized from lost advertising revenue. The jury found that neither such business suffered any damage as a result of loss of revenue because of reduced or retarded paid circulation.

When the pre-trial process was first utilized in this action plaintiffs on May 1, 1959, through their counsel, tendered for consideration by the Court, what is referred to in the evidence as a "Black Book." Such exhibit was, in effect, a pre-trial brief which was represented as being a detailed statement of plaintiffs' claim for "KIMO Radio Damages," damages to "The Pictorial Shopper," and to "The Independence Daily News"; with a statement of "foundation evidence upon which plaintiffs (stated they) would premise any expert witness's testimony as to economic growth" of plaintiffs' business operations. Such exhibit contained 85 pages, including 26 "financial exhibits" asserted to have been made from the books and records as maintained by Craig Siegfried. The pre-trial record reveals that many hours were

consumed considering the contents of that document, to an understanding of its relevancy as evidence under the issues joined in this action. Tersely stated, it represented plaintiffs' then theory of claim for damages allegedly recoverable herein. As utilization of pre-trial process continued, through ten (10) subsequent conferences, the law applicable to plaintiffs' burden of proof, as related to the contents of that document, was thoroughly sounded.

The pre-trial transcript on file in this case patently reveals much confoundment and dilemma existing on the part of plaintiffs' counsel, in an endeavor to relate statements contained in that document to actual, admitted, existing, and known facts.

If this instant memorandum is to be confined within reasonable bounds, it must here be categorically stated that the quantum of damages claimed by plaintiffs, as revealed in the "Black Book", was the chief and dominant subject sounded and attempted to be congealed by this Court throughout the pre-trial procedure used to particularize the issues joined in this action as suggested and outlined in the so-called "Prettyman" report for "Procedure in Anti-Trust and Other Protracted Cases," as adopted by the Judicial Conference of the United States September 26, 1951; and, that during the course thereof counsel for plaintiffs changed and proffered contradictory theories as to proof of quantum of damages claimed in this action, several times. Testimony concerning such contradictory positions was adduced and demonstrated before the jury at the trial of this action.

In relation to the issue as to the quantum of damages plaintiff Craig Siegfried allegedly sustained because of loss of advertising revenue to The Pictorial Shopper: the following statement, found in plaintiffs' suggestions filed January 25, 1961, is enlightening of the position assumed at the trial of this case.

"As to The Pictorial Shopper, in spite of the fact that the profit and loss statements were estimates, there was one set of figures which were not estimates, and whose accuracy was not contested, i. e., the books showing the volume of display advertising business done in each year since 1945. These figures showed, see Plaintiffs' Exhibits 23 and 23A, that *The Shopper* never again did the volume of display advertising business it did in 1948. Plaintiffs prepared and offered in evidence their Exhibit No. 120, (which was rejected at the trial for failure of counsel to comply with pre-trial mandate as to exhibits) attached hereto as Exhibit A, showing that if *The Shopper* had maintained its 1948 volume of display advertising it would have made additional profits in excess of $38,000.00 in the 1950–1957 period. Mr. Mellus testified that over the country generally in areas free of monopoly, suburban weekly publications have experienced a growth of at least 35% in the period. Exhibit B, attached hereto, shows that had *The Shopper* in the damage period, grown 35% in display advertising alone, it would have netted an additional $61,000.00." (Par. added.)

Merely because Craig Siegfried received a given amount of display advertising in 1948, and there has been a 35% growth over the country for suburban weekly newspapers, are not factors, standing alone, to prove that defendants' illegal conduct was the most probable cause of any depreciation of display advertising in The Pictorial Shopper or The Independence Daily News.

This, because the evidence was that Mr. Craig Siegfried commenced publishing The Pictorial Shopper in his own printing plant in the year 1939. He and his brothers commenced operating KIMO Radio in 1947. Mr. Craig Siegfried acquired The Independence Daily News in 1948. In the operation of all such business after January 1, 1953, the evidence is that Mr. Craig Siegfried

maintained one set of books, in which the combined income and disbursements of The Independence Daily News. The Pictorial Shopper, KIMO Radio, with that of the printing plant he operated, were commingled from all sources, and so recorded. In the preparation of exhibits therefrom, used as evidence in this action as to the quantum of damages sustained, the uncontroverted testimony adduced by plaintiffs' own witnesses, was—there was no way, from the manner the books and records of Siegfried were kept, that a breakdown could be made, other than "by approximation." This is so, as to Exhibits 23 and 23A relating to classified advertising in The Pictorial Shopper before 1948, and afterwards as shown in Exhibits 94 through 101.

Expenses incurred in the operation of such businesses were arbitrarily allocated to each business operation. To commence with, as of 1948, a twelve percent (12%) differential as to income collected, from that billed, for display advertising was arrived at by taking the experience of Craig Siegfried in publishing The Pictorial Shopper prior to the time he acquired The Daily News, (a period from 1939 to 1948). Thereafter, eighty-eight percent (88%) of income from display ads, was credited to The Shopper and the balance arbitrarily given to The Daily News. As to classified ads, ninety-eight percent (98%) was arbitrarily given to The Shopper and two percent (2%) to The Daily News. Circulation income was approximated, sixty percent (60%) to The Shopper, and forty percent (40%) to The Daily News, though the evidence established that The Shopper was predominantly a "throw away," i. e. circulated free. The same percentage, 60–40, was used in charging expense of operation between those two businesses. Similar approximations were made as to other items of expense but, as Mr. Bowser, plaintiffs' bookkeeper, testified: "I don't know whether we are right or not, I don't know whether anybody else can be any more so," regarding such matters. The

undisputed testimony is that Mr. Craig Siegfried directed the approximations to be made as to income and expenses between The Shopper and The Daily News, as established by all the above exhibits adduced before the jury in this case, and there is not one iota of testimony, either from Mr. Craig Siegfried, or any other witness, that establishes any factual basis therefor. Mr. Siegfried testified there were many reasons for losing advertising in his publication. For instance, some persons stated they did not like his paper; its editorial policy; competition of The Independence Examiner; the Independence Adviser; overlapping circulation with other papers published in Jackson County; and because all revenue from KIMO, The Pictorial Shopper, and The Independence Daily News was commingled, one cannot allocate income from advertising to any one medium other than on a guess estimate. Hence from the record as made in this case, there is no reasonable basis for a claim of loss of profits resulting from depreciated or retarded advertising revenue, accruing separately to The Pictorial Shopper or The Independence Daily News, from any consideration of probative evidence, or from the books and records as kept and maintained by Craig Siegfried.

However, this fact is clear: there is a great discrepancy between exhibits proffered at pre-trial conference, represented to the Court as being true statements of income earned and expense incurred by Mr. Craig Siegfried, allegedly made from his books, as to each such business operation, and those exhibits that were introduced in evidence at the trial of this case. That fact was established and patently made known to the jury and could only have produced doubt in the minds of the jury that would naturally lead to speculation. The only reasonable inference as to all exhibits introduced by plaintiffs at the trial is that they are based on a "guess" as to what quantum of damages plaintiff Craig Siegfried could, or might, have sustained from individual operations of

The Pictorial Shopper, The Independence Daily News, and KIMO Radio. Counsel for plaintiffs are in error when they state that the accuracy of Exhibits 23 and 23A was not disputed at the trial.

Mr. Mellus and Mr. Krehbiel qualified as expert witnesses in this case to express an opinion on the valuation of suburban and weekly newspapers and the national growth thereof. Mr. Mellus' testimony was to the effect that advertising in suburban newspapers has grown on an average of 30 to 35% nationwide during the period 1950 through 1957; that in an area of free economy suburban papers got ads. from Montgomery Ward, Sears, Penney's, and large food chains. His testimony, as well as that of Mr. Krehbiel, was general, and national in character. Neither witness was asked, nor did they express any expert opinion by which the jury in this case could reasonably measure the quantum of damages Craig Siegfried might, or could, have sustained as a proximate cause of the impact of monopoly in question on his business of operating The Pictorial Shopper or The Independence Daily News, *locally*. Both Mr. Mellus and Mr. Krehbiel related their testimony to suburban newspapers generally. Mr. Krehbiel testified The Pictorial Shopper "was not such a newspaper." Testimony as to newspapers nationally and generally, not reduced to a consideration of a particular operation, could only lead to speculation and conjecture on the part of a jury in measuring plaintiffs' claim for damages in this case.

As to solicitation of ads. by Mr. Craig Siegfried and his employees, from Montgomery Ward, Sears, Katz, The Jones Stores Company, Penney's, Boring's, Pecks, etc.: the Court permitted hearsay testimony (under the exception to the rule that usually excludes that form of testimony) so as to permit plaintiffs to establish a motive and reason given by advertisers and potential advertisers for not publishing, or ceasing publication of ads. in The Pictorial Shopper and The Independence Daily News. Such testimony was admissible for that limited purpose. However, there is not one iota of testimony from Mr. Siegfried, any expert witness, or any other source, as to the probable amount of advertising Siegfried might, or could, reasonably have lost or received from such advertisers but for the monopoly or attempt to monopolize adjudicated. The jury in this case was not given any measuring rod concerning that matter, but was invited by plaintiffs to merely guess and fix the quantum of damages from that source.

Plaintiffs in this case have primarily sued for lost profits. Proof of loss of profits from the operation of a newspaper is different from that presented in the case of a manufacturer, or a motion picture operation. However, the use of gross income, standing alone, is not a criterion of injury in either such case. Wolfe v. National Lead Co., 9 Cir., 1955, 225 F.2d 427. What is involved is net profits that would have reasonably accrued and have been earned by a person engaged in a business of an interstate character but for a monopoly or attempt to monopolize, which becomes an impact on such business operation, in violation of the anti-trust laws. Hence it is anticipated profits which plaintiffs reasonably could have earned but for the monopoly, that are the quantum of damages recoverable herein. It has long been recognized that though the amount of anticipated profits, dependent as they are upon numerous and uncertain contingencies, is not susceptible of proof with certainty, but that fact, standing alone, does not prevent recovery thereof, if there is evidence from which a jury may reasonably estimate, though not exactly, the amount thereof. However, the burden of proof is upon him who claims loss of profits to adduce evidence from which that fact, and the amount thereof, may reasonably be ascertained. One who seeks to recover for the loss of the anticipated profits of an established business, without proof of the expense and income of the business, can hardly be said to have sustained the burden of proof the law casts upon him. What was said by Judge Walter H. Sanborn,

in Central Coal & Coke Co. v. Hartman, 8 Cir., 111 F. 96, 99, to the effect that "proof of the expenses and of the income of the business for a reasonable time anterior to and during the interruption charged, or of facts of equivalent import, is indispensable to a lawful judgment for damages for the loss of the anticipated profits of an established business" remains the law to this day! Cf. Fireside Marshmallow Co. v. Frank Quinlan Const. Co., 8 Cir., 1954, 213 F. 2d 16; Wisconsin Liquor Co. v. Park & Tilford Distillers Corp., 7 Cir., 1959, 267 F.2d 928.

Plaintiffs' position as to the quantum of damages recoverable in this case may be summed up thus: Defendants have been convicted of monopoly and attempt to monopolize; we have been engaged in a competitive business with defendants and other radio stations in the area of economy affected by defendants' adjudicated violations of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note; we must have been hurt in our business operations by the unlawful monopoly and attempt to monopolize perpetrated by defendants; we believe that to be a fact, as we do not now have as much money as we think we should have; but we are hard put to legally demonstrate that matter. As Judge Foley said, in Webster Rosewood Corp. v. Schine Chain Theatres, Inc., D.C.N.D.N.Y.1957, 157 F.Supp. 251, when confronted with similar contention, "This, to me, is not only bad logic but bad law." loc. cit. 257

From the record as here made, from the books and records of plaintiffs; the manner by which proof has been adduced; and the evidence considered as a whole, the only conclusion to reasonably be reached by the Court is, that plaintiffs would not, at a re-trial on the issue of damages, or trial *de novo*, be in any better position to sustain the burden of proof as to the amount of damages, if any, sustained by them, than they were at the prior trial. From the contradictory theories proffered by plaintiffs concerning that issue, the guesswork revealed as to quantum of damage that could

or would be proved, it is transparent that at a trial anew Mr. Bowser's observation would be repeated: "You can do anything with figures." Figures, without supporting data therefor, are not substantial evidence in this, or any other, action at law, regardless of the aura of malefaction in which they are attempted to be enshrouded.

Plaintiffs proffer no objection with respect to the admission or exclusion of evidence at the trial of this case, or to any rulings made by the Court at the trial. Plaintiffs' grounds for new trial, other than as above covered, relate solely to the submission of the case to the jury through the use of interrogatories, permitted by Rule 49(a), F.R.Civ.P. 28 U.S. C.A., and to the supplemental (not to the original) charge given by the Court to the Jury on December 8, 1960, at 4:00 P.M.

Prior to reaching agreement on their verdict, the jurors returned to the Court Room and asked the Court for additional instructions with respect to proof of damages. After reading that part of the instructions originally given on that issue, the Court made the following comments:

"The evidence in the case does leave a void and I know you have had and will have difficulty with this question of the amount of damages. But the burden of proof is upon the plaintiff to sustain the amount of damages with some reasonable degree of certainty in the case. The law casts that burden of proof upon the plaintiffs.

"In my opinion the case does not demonstrate the amount with a reasonable degree of certainty that the plaintiffs in this case have been damaged. That is my opinion. I am expressing it to you but you are not bound by it.

"There may be shown the question of the impact of damage upon those businesses of some kind, to some extent. But the evidence does not demonstrate the amount of loss.

It leaves it, in my opinion, speculative and conjectural.

"There is no evidence of record from which I, as a judge, can ascertain the amount of damages that would reasonably be recovered by the plaintiffs in this case with any reasonable degree of certainty. That is the state of the record. The record was made by the plaintiffs in that fashion.

"Now in view of the form of verdict I have given to you, if you find the plaintiffs were injured in any one of their business operations by reason of the monopoly, but you cannot ascertain the amount of it, you may either put down the sum of one dollar or you may write in the word 'speculative.'"

Thus, immediately after all the evidence was adduced in this case, it was the opinion of the Court that there was a void in the proof with respect to the extent of damages, if any, suffered by the plaintiffs. After review of the evidence, I remain of the same opinion, and that the record as made by the plaintiffs did not afford a basis for ascertaining, with any reasonable degree of certainty, the extent of damages, if any, sustained by the plaintiffs but, rather, left the amount in a speculative and conjectural state. Consequently, the jury was advised that it could either render a verdict in favor of plaintiffs for nominal damages or write in the word "speculative" as to the amount of damages sustained by plaintiffs, and I am satisfied that they were properly so charged under the law.

The jury rendered a verdict stating that in its opinion the evidence of damages was too speculative to be ascertained with a reasonable degree of certainty. Specifically, the jury found that plaintiff Craig Siegfried suffered no damage with respect to alleged loss of circulation revenues, and the loss suffered by plaintiffs with respect to advertising revenues was found to be "speculative." Consequently, plaintiffs have compiled a record in this case which in both the Court's opinion and the jury's opinion, expressed by the verdict of the jury, made a recovery of damages by plaintiffs impossible to ascertain with a reasonable degree of certainty. Plaintiffs have accordingly failed to sustain their burden of proof and are entitled to no more than nominal damages.

In United States v. Philadelphia & Reading Railroad Co., 1887, 123 U.S. 113, loc. cit. 114, 8 S.Ct. 77, 31 L.Ed. 138, the Supreme Court of the United States said:

"Trial by jury in the courts of the United States is a trial presided over by a judge, with authority, not only to rule upon objections to evidence, and to instruct the jury upon the law, but also, when in his judgment the due administration of justice requires it, to aid the jury by explaining and commenting upon the testimony, and even giving them his opinion upon questions of fact, provided only he submits those questions to their determination. Vicksburg & Meridian Railroad v. Putnam, 118 U.S. 545 [7 S.Ct. 1, 30 L.Ed. 257]; St. Louis etc. Railway v. Vickers, 122 U.S. 360 [7 S.Ct. 1216, 30 L.Ed. 1161]."

The opinion expressed by this Court supra had its incubation during pre-trial conferences held herein, where the Court was afforded ample opportunity to consider all aspects of plaintiffs' claim against the defendants. The jury had no such opportunity. They had to take the facts adduced in one solid dose. The Court was compelled to make a note of explanation, and comment on the facts as it did, if the jury was to render a just verdict. They returned the only verdict that could be returned on the record as made by plaintiffs.

In light of the record so made and the verdict of the jury so returned, the Court, in the light of Rule 49(a), F.R. Civ.P., finds the fact to be that plaintiffs are only entitled to recover nominal damages in this case, together with the costs accrued.

Let the following judgment be entered of record herein:

Judgment

On the 8th day of December, 1960, the hearing and taking of evidence having been concluded, and the arguments and summations of counsel having been delivered, and the charge and instructions of the Court to the jury having been given, the jury retired to consider its verdict and thereafter in open court returned a special verdict pursuant to the instructions of the Court as follows:

*"Interrogatories to be Answered by the Jury*

"Do you find and believe from the evidence:

"(1) During the period from January 7, 1950 to January 6, 1953, did The Kansas City Star Company possess monopoly power so as to control and dominate interstate trade and commerce in dissemination of news and advertising, to such an extent as to exclude actual and potential competitors from that field of interstate trade or commerce, and exercise such power with the intent and for that purpose?

"Answer 'Yes' or 'No'    Yes    .

"(2) The same question is propounded to you with respect to the period from January 7, 1953 to December 12, 1957.

"Answer 'Yes' or 'No'    Yes    .

"(3) During the period from January 7, 1950 to January 6, 1953, did The Kansas City Star Company attempt to monopolize interstate trade and commerce in the dissemination of news and advertising for the specific purpose and with the intent to achieve or build a monopoly?

"Answer 'Yes' or 'No'    Yes    .

"(4) The same question is propounded to you with respect to the period from January 7, 1953 to December 12, 1957.

"Answer 'Yes' or 'No'    Yes    .

"(5) During the period from January 6, 1953, did the defendant Emil

A. Sees attempt to monopolize the dissemination of news and advertising in the Metropolitan Area of Kansas City for the specific purpose and with the intent to achieve or build a monopoly?

"Answer 'Yes' or 'No'    Yes    .

"(6) The same question is propounded to you with respect to the period from January 7, 1953 to December 12, 1957.

"Answer 'Yes' or 'No'    Yes    .

"(7) If your answer to all of the above questions is 'No', then you need not make any further answer to the following questions. If any one of your answers to the above questions is 'Yes', then make answer to the following:

"Do you find and believe from the evidence that any such monopoly or attempt to monopolize, as above found by you, was a substantial and proximate cause of damage to plaintiff Craig Siegfried:

"In his operation of The Independence Daily News?

"Answer 'Yes' or 'No'    Yes    .

"In his operation of The Pictorial Shopper?

"Answer 'Yes' or 'No'    Yes    .

"In the operation of Radio Station KIMO from January 1, 1950 to January 1, 1953?

"Answer 'Yes' or 'No'    Yes    .

"In the operation of Radio Station KIMO from January 1, 1953 to December 12, 1957?

"Answer 'Yes' or 'No'    Yes    .

"If you find monopoly power was resident in The Kansas City Star Company, or that The Kansas City Star Company and Emil A. Sees attempted to achieve or build a monopoly, and that either or both such matters were a substantial and proximate cause of damage to the plain-

tiffs' several businesses, then make answer to the following:

"Was the paid circulation of The Independence Daily News substantially and proximately reduced or retarded thereby?

"Answer 'Yes' or 'No'    No    .

"Was the advertising revenue of The Independence Daily News substantially and proximately depreciated or retarded thereby?

"Answer 'Yes' or 'No'    Yes    .

"If your answer is 'Yes' to either one of the last two above questions, in what amount, measured in dollars and cents, do you find from the evidence The Independence Daily News was damaged?

"State such amount; or, 'None' in the following blank space according to your finding:

"    Speculative    .

"Was the paid circulation of The Pictorial Shopper substantially and proximately reduced or retarded thereby?

"Answer 'Yes' or 'No'    No    .

"Was the advertising revenue of The Pictorial Shopper substantially and proximately depreciated or retarded thereby?

"Answer 'Yes' or 'No'    Yes    .

"If your answer is 'Yes' to either one of the last two above questions, in what amount, measured in dollars and cents, do you find from the evidence The Pictorial Shopper was damaged?

"State such amount; or, 'None' in the following blank space according to your finding:

"    Speculative    .

"Was the advertising revenue in the operation of Radio Station KIMO, during the period from January 1, 1950 to January 1, 1953, substantially and proximately depreciated or retarded thereby?

"Answer 'Yes' or 'No'    Yes    .

"Was the advertising revenue in the operation of Radio Station KIMO, during the period from January 1, 1953 to December 12, 1957, substantially and proximately depreciated or retarded thereby?

"    Yes    .

"If your answer is 'Yes' to either one of the last two above questions, in what amount, measured in dollars and cents, do you find from the evidence Radio Station KIMO was damaged?

"State such amount; or, 'None' in the following blank space according to your finding:

"    Speculative    .

"All twelve jurors must agree on each answer, affirmative or negative, that you make to each of the above interrogatories.

"(Signed)    Charles F. McCall
"Foreman of the Jury"

The Court now declares and determines that there is no just reason for delay in the entry of judgment for actual and treble damages under Counts I, II, III and IV of plaintiffs' complaint, and expressly directs entry of judgment therefor.

It Is Therefore Ordered and Adjudged that plaintiffs have and recover of the defendants the sum of $1.00 on each of Counts I, II, III and IV of the Second Amended Complaint.

It Is Further Ordered and Adjudged that the total amount of damages be, and it is hereby, trebled under the provisions of Title 15 U.S.C.A. § 15, and that the total amount of damages to be recovered by plaintiffs on Counts I, II, III and IV is the sum of $12.

It Is Further Ordered that the assessment of attorneys' fees and costs and expenses be taken up at a later date to be fixed by the Court.