**HERMAN SCHWABE, INC., Plaintiff-Appellant,**

v.

**UNITED SHOE MACHINERY CORPORATION, Defendant-Appellee.**

No. 100, Docket 26951.

United States Court of Appeals Second Circuit.

Argued Dec. 1, 1961.

Decided Jan. 4, 1962.

James M. Malloy, Ralph Warren Sullivan, Morton Myerson, Boston, Mass. (Sigmund Moses, New York City, Malloy, Sullivan & Myerson, Boston, Mass., of counsel), for appellant.

Ralph M. Carson, New York City (Davis, Polk, Wardwell, Sunderland & Kiendl, New York City) (Theodore Kiendl, New York City, Robert D. Salinger, Boston, Mass., Louis L. Stanton, Jr., New York City, of counsel), for appellee.

Before SWAN, WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Plaintiff, a New York corporation having its principal place of business in Brooklyn, was organized in 1939 to manufacture shoe machinery, and to distribute in interstate commerce shoe machinery made by itself or by others, primarily European manufacturers. By its complaint, filed in the District Court for the Eastern District of New York on May 27, 1957, it sought to recover from defendant United Shoe Machinery Corporation, a New Jersey corporation having its principal place of business in Boston, threefold damages for the entire period since plaintiff's organization, for injury to its "business or property by reason of anything forbidden in the antitrust laws," as provided in § 4 of the Clayton Act, 15 U.S.C.A. § 15. The complaint charged that defendant had monopolized trade or commerce in a manner forbidden by § 2 of the Sherman Act, 15 U.S.C.A. § 2, as found by the District Court for Massachusetts in a suit in equity, United States v. United Shoe Machinery Corporation, infra, brought by the Government in 1947, and decided by that court in 1953 and by the Supreme Court in 1954, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910. We have previously affirmed an order granting defendant's motion, under the statute of limitations added to the Clayton Act by the Act of July 7, 1955, 69 Stat. 283, 15 U.S.C.A. § 15b, for summary judgment as to all damages accrued before May 27, 1953, Herman Schwabe, Inc. v. United Shoe Machinery Corp., 274 F.2d 608 (2 Cir.), cert. denied 363 U.S. 811, 80 S.Ct. 1247, 4 L. Ed.2d 1153 (1960).

At the end of a trial lasting some nine court days, Chief Judge Bruchhausen directed a verdict for defendant and entered judgment dismissing the complaint. Appellant complains not only of the direction of the verdict but of a number of other rulings. Among these are what is claimed to have been an undue restriction of plaintiff's right, under § 5 of the Clayton Act, 15 U.S.C.A. § 16, to rely on the decree in the Government's suit as prima facie evidence; the treatment of a provision of the decree providing for United's sales of machines previously leased as if this granted anti-trust immunity; the exclusion of evidence of alleged acts of monopolization which antedated May 27, 1953, but which, appellant claims, continued to have an effect thereafter; failure to require United to produce certain documents which, appellant

urges, would have aided its endeavor to explain away testimony by Mr. Schwabe, its president and sole stockholder, before a grand jury that had been investigating United's business practices in 1947 just prior to the filing of the Government's equity suit,[1] and to mitigate the effect of its answer to a Government questionnaire in 1948;[2] the exclusion, as hearsay, of written and oral statements from potential customers; and the exclusion of expert testimony as to damages and various exhibits tendered in connection therewith. Counsel indicated that decision by us as to all these rulings would be welcome since the same issues have arisen, or are likely to arise, in a treble damage suit by a different plaintiff in the District of Massachusetts in which the same attorneys are currently engaged, although any decision by us could have no binding effect on that court. We do not find it appropriate to rule expressly on any of these points save the two last mentioned, since, in our view, plaintiff failed to present evidence of damage sufficient to warrant submission to the jury, and any errors with respect to other elements of the case were therefore not prejudicial.

The economic background is so fully yet (considering its complexity) succinctly set out in Judge Wyzanski's admirable and much admired opinion, United States v. United Shoe Machinery Corp., 110 F. Supp. 295 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), as to relieve us of need for any but the most summary statement. The court there found that United had

acquired control of the shoe machinery market, in which it had attained a "75 plus percentage," by three principal means, the first two of which were innocent and the third not. These were "the original constitution of the company," approved in United States v. United Shoe Machinery Co., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968 (1918); "the superiority of United's products and services"; and "the leasing system," as to which the court particularly mentioned "the 10-year term, the full capacity clause, the return charges, and the failure to segregate service charges from machine charges," as well as the aid the leasing device gave "United in maintaining a pricing system which discriminates between machine types." 110 F.Supp. at 343–344. The Court's decree, dated February 18, 1953, found generally that United had violated § 2 of the Sherman Act "by monopolizing the shoe machinery trade and commerce among the several States" and specifically that "All leases made by defendant which include either a ten-year term, or a full capacity clause, or deferred payment charges, and all leases under which during the life of the leases defendant has rendered repair and other service without making them subject to separate, segregated charges, are declared to have been means whereby defendant monopolized the shoe machinery market." The decree provided that "after A Day" defendant should not offer any machine type for lease unless it also offered the same for sale and should not make any leases save on meeting certain conditions therein defined[3]

1. In this testimony Mr. Schwabe said, *inter alia*, to the apparent surprise of the Government, that certain machines he had imported from Germany in the early years of his business "did not compare with the United Machines"; that United's Ensign lacer was faster than the Albeko lacing machine sold by him; that the Moenus welt sewing machine which he distributed was "About half as slow" as the competing United product; and that "we just can't make more machines, but they [United] don't limit us." Appellant contends that the documents not produced would corroborate Mr. Schwabe's claim that he gave this testimony at United's request and because of fear.

2. This had given negative answers to such questions as "Have you encountered any selling practices by USMC which have been detrimental to your business?", "Have USMC's practices in enforcing its lease agreements with shoe manufacturers operated to hinder your company's business?", and "Has any other action by USMC hindered your company's business?"

3. Among these were that the term should not exceed five years: that the lessee

and that "before B Day" defendant should present plans for terminating all outstanding leases and for disposing of certain parts of its business other than the manufacture of shoe machinery. Ultimately "A Day" was fixed as January 1, 1955, and "B Day" as April 1, 1955.

■ As the statutory language suggests, recovery under section 4 of the Clayton Act, as under its predecessor, § 7 of the Sherman Act, 26 Stat. 209, 210 (1890), "cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted," Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183 (1922).[4] Although later Supreme Court decisions have made it plain that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible," Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931), and that "the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly," Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946), none has detracted from Mr. Justice Brandeis' statement in Keogh or held that mere proof that a defendant has injured its competitors generally warrants recovery in the absence of evidence

should have the right to return after one year on payment of certain charges which in no event should discriminate on account of the substitution of a competitive machine; that there be no "full capacity clause" or "right of deduction fund"; and that service charges after 30 days from installation shall be "separate and reasonable," 110 F.Supp. at 352–353.

4. Although certain cases have awarded or indicated the possibility of awarding nominal damages under § 4 of the Clayton Act, e. g., Pennsylvania Sugar Refining Co. v. American Sugar Refining Co., 166 F. 254, 260 (2 Cir.1908) [dictum in opinion reversing dismissal of complaint]; United Exhibitors, Inc. v. Twentieth Century-Fox Film Distributing Corp., 31 F.Supp. 316 (W.D.Pa.1940); Siegfried v. Kansas City Star Co., 193 F.Supp. 427 (W.D.Mo. 1961); cf. Elgin Corp. v. Atlas Building Products Co., 251 F.2d 7, 12 (10 Cir.), cert. denied, 357 U.S. 926, 78 S.Ct. 1371, 2 L.Ed.2d 1370 (1958), this seems dubious in the light of the language of the statute and the Supreme Court opinions. For opinions pointing against such an award, see Burnham Chemical Co. v. Borax Consolidated, Ltd., 170 F.2d 569, 578 (9 Cir. 1948), cert. denied 336 U.S. 924, 69 S.Ct. 655, 93 L.Ed. 1086 (1949); Turner Glass Corp. v. Hartford-Empire Co., 173 F.2d 49, 51–52 (7 Cir.), cert. denied 338 U.S. 830, 70 S.Ct. 57, 94 L.Ed. 505 (1949); American Can Co. v. Russellville Canning Co., 191 F.2d 38, 54–55 (8 Cir. 1951); Wolfe v. National Lead Co., 15 F.R.D. 61, 63 (N.D.Calif.1953), aff'd after trial, 225 F.2d 427 (9 Cir.), cert. denied 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955); Elyria, Lorain Broadcasting Co. v. Lorain Journal Co., 1960 Trade Cases ¶ 69,831 (N.D.Ohio 1060); Delaware Valley Marine Supply Co. v. American Tobacco Co., 184 F.Supp. 440, 449 (E.D.Pa.1960). There is no general principle in torts, as there is in contracts, that nominal damages may always be awarded if wrongdoing has been proved. McCormick, Damages (1935), § 22, explains that in trespass the rule was always that proof of the defendant's wrongdoing alone entitled plaintiff to nominal damages; that as tort law expanded through the action on the case, "it was established that a vital and necessary element of the plaintiff's case was a showing of actual loss or detriment to him flowing from defendant's wrongful conduct"; that still more recently a fission had occurred, with some actions in "case" requiring proof of damage as an element of the injury and others not; and that "In actions upon claims created solely by statute, the terms of the particular statute are controlling upon the question of whether the actions lie for nominal damages only, there being no proof of actual loss or damage." Whatever the rule as to the reversal of a judgment solely for erroneous failure to award nominal damages may be, see 1 Sedgwick, Damages (9 ed. 1913), § 109 at p. 189; 1 Sutherland, Damages (4 ed. 1916), § 11 at pp. 40–41, appellant has not sought reversal on this score.

that would justify a finding of injury to the particular plaintiff and would supply a rational basis for approximating its amount. To the contrary, "the jury may not render a verdict based on speculation or guesswork," Bigelow v. RKO Radio Pictures, Inc., 327 U.S. at 264, 66 S.Ct. at 579.

■ The gist of appellant's case on liability was that until "A Day," i. e., January 1, 1955, United continued to make the "Form A" lease the decree had found unlawful and that the effects of United's previous monopolization persisted thereafter, not only because many of the Form A leases continued until replaced by the new form, but on the broader ground that customers who had leased United machines under the old form would retain them under new leases or purchases. We need not question the validity of this as a legal theory; as said in William H. Rankin Co. v. Associated Bill Posters, 42 F.2d 152, 155 (2 Cir.), cert. denied 282 U.S. 864, 51 S.Ct. 37, 75 L.Ed. 765 (1930), "The decree could not as a matter of law, and especially not in the face of evidence showing the contrary, be held to have done away with all continuing damage directly traceable to the defendants' former unlawful interference." However, evidence that defendant had unlawfully placed obstacles in the way of competition generally, and that these continued in some measure during the damage period, would not meet plaintiff's burden of proving "damages in some amount susceptible of expression in figures," as the two plaintiffs in Rankin had done by showing that profitable licenses had been unlawfully terminated and offering, in one instance, a history of previous profits and, in the other, such a history supplemented by an estimate, derived therefrom, of profits that would have been likely but for the termination. See Baush Machine Tool Co. v. Aluminum Co. of America, 79 F.2d 217, 227 (2 Cir., 1935).

■ Plaintiff's theory here was not that acts by defendant had unlawfully deprived it of something it previously pos- sessed. It could not well have been so, since there was nothing to indicate that defendant's conduct had changed for the worse during the damage period or, indeed, since plaintiff was organized, and plaintiff's original investment of $10,000 had produced an earned surplus of over $300,000 by 1961, after substantial salary payments to Mr. Schwabe, its sole stockholder, and dividends. Plaintiff's evidence, therefore, was necessarily directed to attempting to show how defendant had unlawfully deprived it of business it might otherwise have secured. It was entirely competent for plaintiff to seek to show this, William Goldman Theatres, Inc. v. Loew's, Inc., 69 F.Supp. 103, 107 (E.D.Pa.1946), aff'd 164 F.2d 1021 (3 Cir.), cert. denied 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948); the trouble was that, unlike the plaintiff in the cited case, it failed to present evidence from which a jury might approximate its loss.

Although, because of defendant's long domination of the market, plaintiff could not show how sales and profits once realized in a free market had diminished, no reason is seen why it could not have proceeded in the opposite direction, by showing how its sales and profits had waxed as United's unlawful practices had waned. Compare Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 194 F.2d 846, 854–856 (8 Cir.), cert. denied 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952). Granting that the relief in the Government's suit, decreed in the main to be effective January 1, 1955, would only "gradually diminish the magnetic hold" of United, 110 F.Supp. at 350, the influence of the practices found unlawful ought surely to have lessened by the time of the instant trial in 1961; we cannot assume that such an elaborate decree, fashioned by an able District Judge after exceptionally thorough study of the industry, and approved by the Supreme Court, would have totally failed to accomplish its objectives in six years. However, plaintiff did not elect to follow any such method of proof—which, obviously enough, ought to have led to a

gradual tapering off of damages during the period—but instead chose a very different one we shall now summarize.

■ Plaintiff's damage evidence was offered through an economist, Peter Max. His first step was to determine the number of United clicking machines outstanding both in the shoe industry and in the non-shoe industry for each fiscal year ending in February, 1939–1959.[5] He next determined Schwabe's share of the clicking machines in the non-shoe field for each year 1939–1960 on the assumption that the total number of such machines outstanding in each year was 10,000. Two further tabulations showed the average number of each of 24 types of United machines outstanding in each year 1954–1959, and the average annual revenue from each; these enabled Max to estimate United's machine revenues for each type of machine for each year. He then applied to these revenue figures a percentage, 15.54%, which was Schwabe's cumulative share of the assumed 10,000 non-shoe clicking machines in 1956; the sum of the products was alleged to be the shoe machine revenues Schwabe would have realized during the six years but for United's illegal acts. This sum was then multiplied by 19.81%, Schwabe's ratio of pre-tax earnings to sales in 1946; the product, $2,777,956, was alleged to represent what shoe machine pre-tax earnings Schwabe would have realized during the six years but for United's illegal acts. Deduction of Schwabe's pre-tax earnings of $195,475, left a balance of $2,582,481; this was claimed to be Schwabe's damages, to be trebled. Max' conclusions were further presented in a series of charts and graphs.

The judge properly excluded this evidence. No basis had been established for the assumption that but for United's unlawful acts Schwabe's proportion, not only of clicking machines in the shoe market, but of each and every type of shoe machinery marketed by United, would have approximated in the six years, 1954–1959, the 15.54% asserted to represent Schwabe's 1956 share of the clicking machines in the non-shoe market. Even as to clicking machines, there was no evidence that United had made the same effort or had the same ability to penetrate the non-shoe market as had created the lawful extent of its power in the shoe market, or that, but for United's unlawful efforts in the latter, Schwabe would have made the same efforts, or would have had the same ability, to penetrate the shoe market that it had in the non-shoe market. The lack of evidence was the more serious because it is undisputed that among the factors accounting for United's large share of the shoe machinery market, both past and present, many were entirely lawful: United's offer of "a long line of machine types, while no competitor offers more than a short line," and "its understanding of the techniques of shoemaking and the need of shoe manufacturers, its efficient design and improvement of machines, and its prompt and knowledgeable service," 110 F.Supp. at 343–344. There was no showing that these factors existed in the non-shoe clicking machine field to anything like the same degree; indeed, plaintiff's own figures that in the year ended Feb. 28, 1959, the fourth year in which the decree was effective, Schwabe's share of the combined United-Schwabe clickers was only 3% in the shoe industry as against 41% in the non-shoe rather indicated that some factors other than illegal monopolization were at work, even as to clickers. All these defects were compounded when Schwabe's alleged non-shoe clicking percentage was applied to other machines. There was no showing either that Schwabe ever had competed, or even that but for United's unlawful acts it would have competed, as to all the 24 types; further, the evidence made it plain that as to some types with respect to which it had competed the Schwabe product was higher in cost or lower in quality or delivery terms.

5. For example, he computed the United clicking machines in the shoe industry in 1953 as 18,495 and in the non-shoe as 4,154.

Beyond this basic defect there were others; we shall mention two. If any basis was provided for Max' assumption that the outstanding non-shoe clicker machines numbered approximately 10,000, we have not found it. The use of the 19.81% of sales carried down to pre-tax profits by Schwabe in 1946, was quite indefensible; this was by all odds the highest ratio of profits to sales ever experienced by Schwabe, the next highest being 11.14% in 1950, and nearly six times the average, 3.3%, during the years 1954–1959 for which damages were being computed.[6]

There is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counter-attack, from evidence that is not. Especially because of the guaranty of the Seventh Amendment, a federal court must be exceedingly careful not to set the threshold to the jury room too high. Yet it is the jury system itself that requires the common law "judge, in his efforts to prevent the jury from being satisfied by matters of slight value, capable of being exaggerated by prejudice and hasty reasoning * * * to exclude matter which does not rise to a clearly suffi-

cient degree of value"; "something more than a minimum of probative value" is required. 1 Wigmore, Evidence (3d ed. 1940), pp. 409–410. These comments are especially pertinent to an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it. It might indeed have been possible for a judge, with days in which to study the exhibits of plaintiff's expert, to come up with some rational computation of damages, on a theory wholly different from what the expert advocated, that would satisfy the Supreme Court's modest requirements in this area;[7] it would be foolhardy to expect a jury to do so. "When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out," Shepard v. United States, 290 U.S. 96, 104, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1933).

These principles required exclusion; the leap required to derive any rational conclusion from the expert's data was too great to allow a jury to take. Many decisions have rejected evidence of injury and damages comparable in weight with that submitted here. Baush Machine Tool Co. v. Aluminum Co. of America, supra; Momand v. Universal Film Ex-

---

6. In 1959 and 1960, the fourth and fifth years after the decree in the Government suit had become effective, Schwabe's ratios of pre-tax profits to sales were 3.33% and 3.82%.

The figures, also excluded by the court, showing Schwabe's pre-tax profits for years before and after the decree had become effective, likewise furnished no basis from which a jury could make an award of damages. These were, in each case for the years ending September 30:

| | |
|---|---|
| 1952 | $39,671 |
| 1953 | 39,962 |
| 1954 | 49,672 |
| 1955 | 27,330 |
| 1956 | 33,065 |
| 1957 | 25,568 |
| 1958 | 1,981 |
| 1959 | 49,975 |
| 1960 | 65,442 |

Plainly there is no correlation with the effective date of the decree. It may also be noted that Max' method produced the illogical result of showing an increase in

damages from $377,831 for the fiscal year 1954, before the decree had become effective, to a peak of $467,211 in 1958 and a figure of $443,940 in 1959.

7. For example, plaintiff's figures showed that its proportion of the outstanding United-Schwabe shoe clickers had risen rather steadily, from 2.3% in 1954 to 3.1% in 1959. It might not be irrational to conclude that in a free market plaintiff would have had at least the latter proportion of the clicker shoe machinery business throughout the damage period, and to estimate constructive sales and profits on that basis; indeed, a person expert in statistical analysis might have been able to construct trend lines that would support a higher proportion. However, any such calculation would be quite beyond the powers of a jury, even if it had been suggested. Moreover, the results would have been only a modest fraction of those given by plaintiff's expert even for clickers, and the record did not afford even that much of a basis for a calculation as to other items.

changes, Inc., 172 F.2d 37, 43–44 (1 Cir., 1948), cert. denied 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949); Emich Motors Corp. v. General Motors Corp., 181 F.2d 70, 83–84 (7 Cir., 1950), rev'd on other grounds 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951); Wolfe v. National Lead Co., 225 F.2d 427, 433–434 (9 Cir.), cert. denied 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955); Flintkote Co. v. Lysfjord, 246 F.2d 368, 392–394 (9 Cir.), cert. denied 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); Clapper v. Original Tractor Cab Co., 270 F.2d 616, 630–634 (7 Cir., 1959), cert. denied 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960); Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 284 F.2d 1, 32–34 (9 Cir., 1960); Siegfried v. Kansas City Star Co., 193 F.Supp. 427, 436–437 (W.D. Mo.1961). In the Supreme Court cases earlier cited, the plaintiffs not only had shown defendants' wrongful acts but had presented "evidence of the decline in prices, profits and values, not shown to be attributable to other causes," which warranted the jury's concluding "that defendants' wrongful acts had caused damage to the plaintiffs," Bigelow v. RKO Radio Pictures, Inc., 327 U.S. at 264, 66 S.Ct. at 579, 90 L.Ed. 652. In Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709 (9 Cir., 1959), cert. denied 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960), relied on by appellant, the plaintiff offered evidence that its product, which had been denied access to defendant's service stations, had outsold a competing product in other service stations of the same sort; the similarity of the markets was there proved, as in many of the motion picture theatre cases, and the opinion distinguished the Wolfe and Flintkote cases in the same circuit, which we have previously cited.

Even though plaintiff's general proof of damage was thus properly excluded, a verdict should not have been directed against it if it had proved that defendant's unlawful acts had caused the loss of specific sales and had shown the damage therefrom. This it likewise failed to do.

Mr. Schwabe testified that in 1952 he had negotiated for the sale of clicking machines to Endicott-Johnson. A machine had been installed on trial, and Schwabe had drafted a contract for the sale of 850 over a ten year period.[8] The contract was not signed; Schwabe did not say why. In April, 1954, in the course of a written inquiry as to Endicott-Johnson's decision on a high speed roughing machine, he noted that "Two years have passed since we made the proposal on the clicking machines" and asked "Do you think this matter can be revived again?" The purchasing agent answered that the roughing machine "did not prove very successful," that "As to the clicker, I do not know today what the answer is and we have not entirely forgotten them," but that "One thing we would be interested in if you had a twin clicker which would compare with the USMC machine." There the story ends. Clearly it permitted no inference that sales to Endicott-Johnson had been lost due to United's unlawful acts; if any inference could be drawn, it would be rather that Endicott-Johnson was quite receptive to competing products as good as United's.

Appellant also sought to introduce letters from five shoe manufacturers and a conversation with a sixth, ranging over a six and a half year period, which we summarize in the margin;[9] the judge

---

8. Delivery was to be at the rate of 85 machines per year at a price of $1100 per machine; this included a profit margin of some $250.

9. Letter dated Oct. 1, 1953, from Tex Tan of Yoakum expressing interest in a cementing machine and a back seam rubbing machine: "In reference to the clicking machines, we have done nothing. We are

still going along with the USMC machines on a lease basis. Possibly some day we may get around to outright purchase of clickers, and discontinue paying the monthly rentals. When we do, we will be glad to give you a chance to put some of your machines in our shop."

Letter dated Dec. 17, 1954, from Bachman Shoes, Inc., asking for "a price list of the various machines you have as we

excluded these as hearsay. Appellant says this was error since the letters and conversation came within the hearsay exception for declaration of a motive or reason, 6 Wigmore, Evidence (3d ed. 1940, § 1729(2). Statements of a customer as to his reasons for not dealing with a supplier are admissible for this limited purpose,[10] Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341 (1915); Greater New York Live Poultry C. of C. v. United States, 47 F.2d 156, 159 (2 Cir.), cert. denied 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1448 (1931), although not "as evidence of the facts recited as furnishing the motives," Buckeye Powder Co. v. E. I. du Pont de Nemours Powder Co., 248 U.S. 55, 65, 39 S.Ct. 38, 40, 63 L.Ed. 123 (1918). However, the Supreme Court said in the Buckeye case: "We should be slow to overthrow a judgment on the ground of either the exclusion or admission of such statements except in a very strong case."

Ibid. The case here was anything but that. Although the excluded statements may have shown that some effects of United's monopoly persisted, they did not show what damage, if any, Schwabe had suffered therefrom. On the other hand, to the extent that the excluded statements showed that Schwabe's opportunity to compete with United for the business of these manufacturers had been improved, in an indeterminate degree, by the various steps the District Court had directed United to take, appellant made no offer of proof that this improved position had ultimately resulted in sales to these six manufacturers, thereby permitting an inference that similar sales would have been made earlier but for United's monopolization; if United still kept the business or if it went to others, then this might equally have occurred for innocent causes during a period of monopolization. Still less did appellant offer to prove the amount of sales to these

---

feel we could use this to good advantage in changing over to your machines as the leases on our United Machines expire."

Letter dated Jan. 17, 1955, from Enterprise Shoe Company, asking for cost information in order to be able to compare this with United's "at the time they have their final figures available."

Letter dated March 6, 1956, from Florsheim Shoe Company, stating it had purchased "every one" of its insole channeling machines "and our cost on these machines was considerably under $500.00 average. In view of this, we would not be interested in the purchase of additional machines unless there was a decided improvement in these machines and the price warranted this." The price of the Schwabe machine, sold new, was $1200.

Letter dated May 6, 1960, from Allegro Shoe Corporation, stating it had tested appellant's splitting machine, which had been found to have "certain advantages, but it definitely doesn't justify the difference of $700.00, since we can purchase the machine from United Shoe that we have presently for $1473.76 * * * Compared to all the other machines on the market, with the exception of the old United machine, it definitely would be our choice if we ever replace the machine that we have, or require a second one."

In addition, Mr. Schwabe was prevented from stating "what reasons were given to

you by Selby Shoe Company for their refusal to take your machines?" in 1955; no offer of proof was made, as F.R.Civ. Proc. 43(c), 28 U.S.C.A., requires.

10. Even as to this the trial judge should have some discretion in view of the risk of insincerity in a potential customer's statement why products were not being ordered. It should not be forgotten that the basis for admitting statements of mental or physical condition even from declarants not unavailable, is that later testimonial utterances "where there is ample opportunity for deliberate misrepresentation and small means for checking it by other evidence or testing it by cross-examination, are comparatively inferior to statements made at times when circumstances lessened the possible inducement to misrepresentation," 6 Wigmore, Evidence (3 ed. 1940), p. 58; it may be doubted how fully these considerations apply to statements of the sort under review. On the closely related subject of the use of declarations of intention to prove a future act, the Supreme Court of California requires that the declaration "must have been made under circumstances which naturally give verity to the utterance," People v. Alcalde, 24 Cal.2d 177, 148 P.2d 627, 632 (1944). See United States v. Annunziato, 293 F.2d 373, 377–378 (2 Cir. 1961).

manufacturers or the profit thereon. Admission of the manufacturers' statements thus would not have cured the vital flaw in appellant's case—its failure to proffer any evidence permitting the jury to make a rational determination of its damages.

Affirmed.