**MONONA SHORES, INC., et al.,**
**Plaintiffs,**

v.

**UNITED STATES STEEL CORPORA-**
**TION et al., Defendants.**

**No. 4–71 Civ. 467.**

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 27, 1973.

Dygert & Dygert, Minneapolis, Minn. by Robert W. Dygert, Jerry G. Dygert, and W. Dale Weyhrich, Minneapolis, Minn., for plaintiffs.

Briggs & Morgan, St. Paul, Minn. by Edward C. Stringer, and Gerald L. Svoboda, St. Paul, Minn., for defendants United States Steel Corp. and United States Steel Credit Corp.

O'Connor, Green, Thomas, Walters & Kelly, Minneapolis, Minn. by Joe A. Walters, and Frank J. Walz, Minneapolis, Minn., and Foley & Lardner, Milwaukee, Wis., by David E. Beckwith, Milwaukee, Wis., for defendant Mortgage Associates, Inc.

NEVILLE, District Judge.

In 1965 plaintiffs and defendants entered into a contract or contracts to assist plaintiffs to develop a piece of real estate in Madison, Wisconsin. Although there has been previous litigation between the parties over the contracts and real estate in state court in Wisconsin, the contract and its performance or non-performance are the basis of this action. Here plaintiffs make various claims, including violation of the federal antitrust laws on the part of United States Steel Corporation, and defendants assert counterclaims. Presently defendants move for dismissal claiming a violation of Rule 37 of the Federal Rules of Civil Procedure, and on the basis of the statute of limitations, and the application of principles of res judicata. Plaintiffs similarly assert res judicata as a basis for summary judgment on their counterclaims. Jurisdiction is bottomed on an alleged violation of the antitrust laws, 15 U.S.C. §§ 1 and 2, and on pendant jurisdiction. The court has been furnished with a number of affidavits and a rather complete record of the proceedings had in the Wisconsin State Court.

Plaintiffs are Russel Lesperance, his wife Virginia, and four corporations which they own: Monona Shores, Inc. (Monona Shores) is a land development corporation which joined with the other plaintiff corporations to construct an apartment complex on the Madison real estate; Todd Builders Inc. is a general contractor; Award Design, Inc. is an architectural and engineering firm; and Pocar Construction, Inc. is a masonry, concrete and carpentry contractor. There is little dispute over the fact that Mr. Lesperance controlled and operated all these corporations, and he asserts that under his direction the group had substantial experience in real estate development.

Defendant United States Steel Corporation, *inter alia*, manufactures and sells prefabricated steel dwellings. This product is an appropriate component part for the type of apartment complex Monona Shores intended to construct. United States Steel Credit Corporation (US Steel Credit), provides real estate financing. Mortgage Associates, Inc. (MAI) is a mortgage banker which endeavored to provide interim financing, i. e., provide funds to the developer for the period between the inception and completion of construction with the thought that when the project is completed long term financing will become available from other sources.

In early 1965 plaintiff Lesperance acquired the tract of land in Madison, Wisconsin. The land bordered Lake Monona and Lesperance incorporated plaintiff Monona Shores to take title. He then initiated a rather major development involving nearly three hundred apartment units, commercial space, and a community center.

To this end Monona Shores secured long term financing for up to $3,500,000 from the Equitable Life Assurance Society of the United States (The Equitable). However, this financing by contract was not to become available until the project was completed and was accepted by The Equitable as in conformance with the plans.[1] This commitment then served as the basis for Mortgage Associates' interim financing since the interim financer needed assurance that at completion long term financing was available. The Equitable financing commitment required that during construction Monona Shores should pay $4,375 every four months to retain the long term commitment.

There was another contingency on The Equitable commitment: while $3,000,000 was payable on completion of construction, the final $500,000 was due only when a certain number of units had been rented. Thus Monona Shores was faced with the need to provide "gap" financing for this last amount, together with the interim financing to subsidize the construction period itself. MAI was

---

1. The project was originally scheduled to be completed on November 1, 1967.

engaged to arrange this additional "gap" financing. First, interim financing was obtained from US Steel Credit using MAI as a conduit. Then, MAI arranged for "gap" financing through A. I.C. Financial Corporation (AIC).

On December 8, 1965 Monona Shores entered into the contract at the heart of this action with US Steel Credit and MAI which provided that US Steel Credit would lend $3,500,000 to MAI, who would then lend this same amount to Monona Shores. In return Monona Shores gave notes and the Lesperances pledged all Monona Shores stock as additional security for MAI. Thus MAI was able to foreclose or to exercise its rights under the pledges and take control of Monona Shores if the contract was breached. The Lesperances also added their personal guarantees to the notes. Of course the existence of The Equitable long term financing commitment served as additional security for the lenders.

Monona Shores claims that as a condition to receiving the interim financing the defendants required it to agree to purchase the great majority of its prefabricated dwellings from United States Steel Corporation. This is claimed to be an illegal tying arrangement violative of the antitrust laws. The credit is styled the tying service and the dwellings are styled the tied product. Defendants deny any violation of the antitrust laws.

Although AIC did not sign the above contract, its part in the financial structure of the Monona Shores project was important inasmuch as it had agreed to provide the "gap" financing. This would take effect from the time the US Steel Credit commitment ended, when the project was completed, until a certain number of apartments were rented and the last $500,000 of The Equitable commitment became due. AIC, like The Equitable, required regular commitment fees paid during construction to maintain its financing commitment in effect. On the day the contract between the parties was executed, December 8, 1965, the first such fee was due. It was paid.

A second fee was due on November 11, 1966.

A central feature of the funding of this project was the precarious interdependence of the financing commitments. It appears that if Monona Shores breached its agreement with any of the lenders or potential lenders, that lender could declare its duty at an end and the others could use this as the basis of declaring their duties terminated. Thus a breach of any of the financing agreements could cause the entire Monona Shores funding structure to collapse. Accordingly, seasonable payment of commitment fees was crucial.

Construction commenced in early 1966. Ongoing charges were paid by disbursements authorized by US Steel Credit, using MAI as a conduit. Monona Shores regularly requested certain payments be made and the moneys were released when MAI added its authorization. United States Steel Corporation immediately began delivering material which Monona Shores now claims was both defective and grossly overpriced.

Construction continued through 1966, though both parties agree that sometime in that year it became apparent that the original cost projection for the entire project was too low. Plaintiffs claim that the added expense was due to United States Steel Corporation having forced them to accept materials at inflated prices. The defendants simply claim that the project was running substantially in excess of budget and that towards the end of 1966 they began to feel it was financially insecure.

In any event, additional funds were needed. Monona Shores reacted by seeking added financing from Diversified Realty Investment Fund (DRIF) in September of 1966. DRIF agreed to buy one-half of Monona Shores' interest in the project for $750,000. Plaintiffs claim this agreement was the basis of a loan which the First Wisconsin National Bank of Milwaukee agreed to make to MAI to help complete the project. Defendants deny this and claim any com-

mitment made by the bank was solely on the basis of MAI's credit. However, the DRIF transaction was never completed, apparently because DRIF experienced financial difficulties itself at this time.

In November of 1966 payment of the second commitment fee to AIC was due. It appears that MAI was to make the payment and it is uncontested that the payment was not made. AIC immediately availed itself of the option of declaring its "gap" financing commitment at an end. MAI claims that it attempted to find replacement financing for that commitment but was unsuccessful. Monona Shores claims that MAI represented it would obtain substitute financing within seven days and that Monona Shores relied upon this representation to its detriment.

In January of 1967 MAI refused to release any further payments claiming Monona Shores could not show the amount due would complete the project. MAI asserts that it had dispersed over three million dollars by this time. Monona Shores contends that it made repeated requests to MAI to continue to finance the construction; and it claims that MAI repeatedly assured both it and the subcontractors on the job that substitute financing was forthcoming. This assurance allegedly caused subcontractors, as well as Monona Shores' employees, to stay on the job without pay.

In the spring of 1967 MAI took decisive action. Although MAI concedes that it did receive an additional financing commitment from the First Wisconsin National Bank of Milwaukee, it did not accept this offer, nor did it take control of Monona Shores through the stock pledges it held; instead it chose to foreclose. That action was begun on April 8, 1967 in the Circuit Court of Dane County, Wisconsin with MAI as plaintiff and Monona Shores, US Steel Credit and various subcontractors as defendants. There MAI alleged that Monona Shores had failed to pay interest as it became due, failed to construct the project in a workmanlike manner, failed to

prosecute construction diligently and thus the project would not meet the appointed date for completion, failed to show that the remaining funds to be dispersed were sufficient to cover the remaining project improvement costs, failed to give MAI cost breakdown figures to indicate how much additional funding would be necessary to complete the project (although MAI claimed its independent inspection indicated $1,200,000 in excess of MAI collateral security would be necessary), and failed to pay general and special taxes due the City of Madison. Plaintiffs here concede that the filing of the foreclosure petition "prevented any further work on the project." (Complaint, ¶ 34). Apparently by this time all the subcontractors had left the job; thus United States Steel Corporation could not have made and did not make any deliveries under this contract subsequently.

The Wisconsin court appointed a receiver, an MAI employee, and ordered completion of the project. A different contractor was employed and substantial additional costs were incurred. It appears from the pleadings and other papers from that case, filed in this court, that the Wisconsin action was vigorously litigated. The trial lasted several weeks. Ultimately, the court rendered findings and conclusions favorable to MAI and judgment accordingly was entered on December 30, 1968. The decision was appealed to the Supreme Court of Wisconsin and affirmed. Mortgage Associates Inc. v. Monona Shores, Inc., 47 Wis.2d 171, 177 N.W.2d 340 (1970). MAI purchased the completed project at a sheriff's sale in 1970.

On September 10, 1971 the complaint in this action was filed in this court.

Several motions are before the court at this time. Defendants have moved to dismiss all claims against them based on Fed.R.Civ.P. 37(b)(2) claiming a wilful attempt to defraud the court by plaintiffs' production of forged documents. They also move under Rule 56 to dismiss plaintiffs' first claim, an allegation of violations of the antitrust laws, arguing

that the statute of limitations has run. Finally, they move for summary judgment under Rule 56 to dismiss plaintiffs' second, third, sixth and seventh claims arguing that the issues are barred under principles of res judicata.

Plaintiffs move to dismiss certain of the defendants' counterclaims, on res judicata principles, arguing merger based on the same Wisconsin Supreme Court case upon which defendants rely. The statute of limitations motion will be discussed first, then the res judicata motions, and finally the Rule 37 motion.

## I

### STATUTE OF LIMITATIONS

Defendants have moved under Rule 12 of the Federal Rules of Civil Procedure for dismissal of plaintiffs' antitrust claim. They argue that the applicable statute of limitations has run. Private antitrust claims are controlled by 15 U.S.C. § 15b:

Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued.

For the purposes of this motion it is assumed that (1) defendants have violated the antitrust laws as pleaded, (2) plaintiffs have been damaged, (3) defendants' violations proximately caused the damage.[2]

The definitive interpretation of 15b is Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). There the Supreme Court held that:

. . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. . . . each separate cause of action that so accrues entitles a plaintiff to recover

not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial. . . . even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable. . . . In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.

The Zenith holding as it pertains to "speculative" and unprovable damages is important for the purposes of this motion. Plaintiffs have pleaded damage in three respects:

(1) excessive costs for the purchase of the steel homes package

(2) cost overruns resulting from the defective steel home package produced by defendant United States Steel Corporation

(3) eventual foreclosure of the Monona Shores project and entry of a deficiency judgment.

However, plaintiffs admit that the first two elements of damage were not "speculative" four years prior to the date the complaint was filed, September 10, 1971, and thus it is clear that as to those damages the statute of limitations has run and they are barred. Conjecture centers on the application of the Zenith rule to the third element of damage and whether these damages were "speculative" on September 9, 1967. If they were plaintiffs' antitrust claim is still viable.

Plaintiffs argue that the foreclosure did not injure them until it was finally

---

2. Defendants do not concede violation of the antitrust laws nor do they concede causation or damages.

completed in court; thus plaintiffs assert that since the foreclosure action was not decided by the Milwaukee Circuit Court until 1968, and the final decision by the Wisconsin Supreme Court was not handed down until 1970, that Monona Shores' property was not completely lost until the latter time. Until the Wisconsin Supreme Court made its decision it was conceivable that foreclosure may have been avoided. Thus there would not have been any injury, so the plaintiff argues. Absolute certainty as to foreclosure is the standard which the plaintiff would require before damage occurs. And of course until damage occurs the statute of limitations does not commence to run.

Plaintiffs further argue that even if the fact of damage had occurred prior to September 9, 1967 the extent of damages remained unprovable until that date or after. Plaintiffs claim that then the cost of completing the apartment project was "pure conjecture" if only because the receiver's costs had not yet then incurred and, so the argument goes, could not be ascertained. Accordingly, plaintiffs claim that no reasonable estimate as to the extent of a deficiency judgment to be entered against Monona Shores could have been made at that time.

Defendants contend quite the contrary. They assert that both the fact and the extent of damage were ascertainable and provable on September 9, 1967. If this is the case the four year statute of limitations would bar a claim filed September 10, 1971. Defendants claim the facts that the foreclosure proceeding had been initiated, that a receiver had been appointed, and that Mr. Lesperance had admitted in deposition that the project was "irrevocably lost in April of 1967" show that the damage had occurred and was provable. Further, they argue that the extent of damage was ascertainable through expert estimation of the cost of completion prior to September of 1967—even that plaintiffs themselves had made accurate predictions of the ultimate costs of completion before that time.

A closer look at *Zenith* is appropriate. The court's holding that as to speculative damages a cause of action does not accrue, and the statute of limitations does not begin to run, until the "date they are suffered" requires this court to make a finding as to plaintiffs' situation at some past point in time. This court must look to the day before the statute of limitation period. Here that would be September 9, 1967, four years and one day prior to the commencement of this action. If antitrust damages were speculative on that date then the statute of limitations does not bar this action. If they (1) had been suffered, and (2) were provable on that date then the plaintiff's claim is barred. This court must ask itself whether, on September 9, 1967, plaintiff could have shown a district court the fact and extent of injury. The procedure is not unlike that used in *Erie* cases, where a federal court must by reasoned analysis attempt to arrive at the decision which a state Supreme Court would make on an issue. *E. g.,* Brooten v. Cudahy Packaging Co., 291 F.2d 284 (8th Cir. 1961). In *Zenith* the Supreme Court performed this type of chronological reflection as to some of Zenith's damages and found them not provable at the critical point in time.

The central policy the Supreme Court sought to further in *Zenith* was vigorous enforcement of the antitrust laws. The court's rule assures that the statute of limitations may not bar a claim before an injured person has suffered *provable* damage. In fact, the court noted that any other rule would allow some damages to go unremedied. It is clear that strong enforcement of the antitrust laws through private actions and a concern that damage caused by a violation of those laws not go unremedied are principles which the Supreme Court emphasized in *Zenith*.

But it should be noted that the court was aware that this reflection which it required of a district court must be an imprecise procedure. Thus, the court

indicated that a district court has discretion on the issue:

> We do not, of course, have the thinking of the district judge on this issue, and ordinarily the matter of future damages would very much depend on his informed discretion.

401 U.S. at 340.

Several cases have dealt with the procedure required by *Zenith*. In Railing v. United Mine Workers of America, 445 F.2d 353 (4th Cir. 1971), the court outlined a method for applying *Zenith:*

> Applying *Zenith* to our case we think that on remand the District Court should (1) consider the situation at the earliest date of applicability of the statute of limitations . . . (2) determine which elements of damage would have been sufficiently ascertainable on or before [that date] and adjudge such claims barred by the period of limitations; (3) determine which elements of damage were speculative and not provable at that time, and adjudge that the period begins to run with respect to such speculative damages at the time that they could be proved up with reasonable precision."

445 F.2d at 354–355, *accord* Continental-Wirt Electronics Corp. v. Lancaster Glass Corp., 459 F.2d 768 (3d Cir. 1972). In this case, as was mentioned above, the earliest date of applicability of the statute of limitations is September 9, 1967. This court must find which damages were speculative as of that date. The essential difference between the parties is over how the word "speculative", as used in *Zenith* and other cases, is to be defined.

■ It should be noted that the *Zenith* case does not require that the plaintiff have the best evidence possible of his damage, but rather only that the damages be provable. This court is aware that in some cases, and perhaps this is one, damages are better proven at a later time. However, that does not mean at an earlier point in time, enough evidence of damage was not available to allow the issue to go to a jury. When there is enough evidence to allow the issue to go to a jury the damages are no longer speculative, notwithstanding that at a later time better evidence of damage might become available.[3] "The *moment* the victim can prove . . . damages, the statute begins to run leaving four more years . . . to assert them." Poster Exchange, Inc. v. National Screen Service Corp., 456 F.2d 662, 667 (5th Cir. 1972) [Emphasis added].

■ It would be a rather unworkable standard to allow a plaintiff to avoid the prodding of the statute of limitations until he had every conceivable piece of evidence of his damage. The difficulty for a court in applying such a standard is obvious. Moreover, it is clear that once the fact of damage has been established there is a lesser burden of proof upon the plaintiff to establish the extent of the damage. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562–568, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Arthur Murray, Inc. v. Oliver, 364 F.2d 28, 35 (8th Cir. 1966). This relatively lighter burden combined with the *Zenith* holding makes it difficult for this court to accept the contention that damages, for the purposes of the statute of limitations, do not cease to be speculative until the best evidence conceivable of their existence is available.

Plaintiffs here claim that until the Wisconsin Supreme Court affirmed the foreclosure of the Monona Shores prop-

---

3. In Siegfried v. Kansas City Star Co., 298 F.2d 1 (8th Cir. 1962), the court dealt with the word "speculative" but in a different context than here. Although the court did indicate that damages may still be speculative even when there is enough evidence to allow the issue to go to a jury, the case did not deal with a statute of limitations problem. Moreover, all the court really held by using the word "speculative" in the manner it did is that although there is enough evidence to go to a jury, the jury need not believe the evidence and may still find that plaintiff suffered no damage.

erty there was no certainty that the foreclosure would occur. Thus, they continue, until that time they had not been injured. And, until that time the statute of limitations did not commence. They further argue that the extent of their damage was not provable until that time because there could be no accurate prediction of the extent of the deficiency judgment that they ultimately suffered. Defendants claim that plaintiffs were damaged when the foreclosure was instituted and the extent of their damage was estimable by appraisal at that time. The defendants' argument is the better one.

■ Damages are suffered in the marketplace, and only sometimes is this damage reflected by the judgment of a court. *Cf.* Standard Oil Co. of Calif. v. Moore, 251 F.2d 188 (9th Cir. 1957), cert. denied 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). Plaintiffs certainly cannot be arguing that the market value of their interest was not damaged by the commencement of foreclosure proceedings. At that point in time they certainly could have gone to a jury with the claim that their interest had been destroyed. Expert appraisals are proper evidence in such cases although they might require predictions in making calculations. Atlas Building Prod. Co. v. Diamond Block & Gravel, 269 F.2d 950 (10th Cir. 1959), cert. denied, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727, Kobe Inc. v. Dempsey Pump Co., 198 F. 2d 416 (10th Cir. 1952). Work had ceased on the project. The financing had collapsed. Plaintiff Lesperance did not arrange for substitute financing and the implication is quite strong that he could not arrange for it. Most important, plaintiff Lesperance had lost effective control of his property at this time. It is difficult to say that he could not have taken a claim that his property was lost to a jury at that time. His damages had been suffered when the property went into receivership. The final action of the Wisconsin Supreme Court only sealed the issue. A jury dealing with the extent of damage may act on probability and inference. Locklin v. Day-Glo Color Corp., 429 F.2d 873, 880 (7th Cir. 1970), cert. denied, 400 U.S. 1020, 91 S. Ct. 582, 27 L.Ed.2d 632 (1971).[4] A jury, or a judge, viewing the situation as of September 9, 1967 could have inferred the ultimate outcome of the litigation in Wisconsin. But even if this was disregarded there is no doubt that plaintiffs could have made a strong argument at that time that their property was lost.[5] The fact that they could have made that argument then precludes them from making it now. Plaintiffs would have been aided by liberal rules of damage proof.

The United States Supreme Court has allowed juries to estimate damages in some situations. An excellent example is Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). There the Court allowed a jury to estimate damages after indicating that since a plant had been closed due to defendants'

---

4. The evidence may even be estimates based upon assumptions as long as the assumptions rest upon an adequate base. Herman Schwabe, Inc. v. United States Shoe Machinery Corp., 297 F.2d 906 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). The proof need not be direct but may be circumstantial. Keogh v. Chicago & N. W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). To allow the fact finder appropriate discretion in the matter of the extent of damages, the Supreme Court has indicated that the clearly erroneous standard is appropriate on appeal. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

5. By letter on September 1, 1966 MAI advised Monona Shores that the latter was in default on the mortgage. (Memorandum opinion of Judge Sachtjen, Dane County Circuit Court, November 26, 1968 at p. 9). Surely this letter was proper evidence of damage at that early time. And the Wisconsin Supreme Court stated that Monona Shores "had knowledge as early as September, 1965, that its original financing was not sufficient." 177 N.W.2d at 347. It seems reasonable that given this state of affairs plaintiffs could have garnered proof of damage before September, 1967.

illegal conduct the existence of damages could not be gainsaid. The present case is similar. The construction had ceased and the financing had terminated. Damage was clear; only the extent was debatable. Under *Story* it would seem the issue should have gone to the jury. Accordingly, the statute of limitations commenced to run prior to September 10, 1967.

The cases which have applied the *Zenith* standard and found damages not provable at a certain point in time have dealt with damages much less clear than those claimed by Monona Shores. In *Zenith* itself the imprecision of forecasting a market share caused damages to be held speculative. No such feat would have been necessary here. Ansul Company v. Uniroyal, Inc., 448 F.2d 872 (2d Cir. 1971), dealt with hypothetical future sales and Continental-Wirt Electronics Corp. v. Lancaster Glass Corp., 459 F.2d 768 (3d Cir. 1972), dealt with damage to an operating business. Monona Shores was never in a situation analogous to an operating business. However, in *Continental-Wirt* the court indicated that damages remained speculative:

> until a sufficient time for reasonable attempts to sell the business had expired or the sale of the business had been made.

459 F.2d at 770. In the present case the foreclosure or the appointment of a receiver might be equated to the sale in *Continental-Wirt*. Still, the difficulties of proving the value of future sales or market share or the proper price for a going business, i. e. with goodwill, are obviously more difficult than estimating the probable completion cost, to include receiver costs, of an apartment project which was already partially completed.

The application of the *Zenith* standard recommended by plaintiffs is impractical. It would require that the antitrust statute of limitations not commence until other legal issues had been litigated through a state supreme court or some other ultimate tribunal. This has no relationship to the time when evidence is fresh and a case is appropriate for trial. *Zenith* itself requires the statute commence as soon as damages are suffered and become provable. It is difficult to say the damages were any more provable after the Wisconsin Supreme Court decision than they were after the Wisconsin Circuit Court decision, or even after the receiver was appointed. Following plaintiffs' theory, the antitrust statute of limitations would be dependent on the size of the docket in state courts. It would not be a set time period for all, but would vary almost by chance.

The procedure has the potentiality of being unfair for both plaintiffs and defendants. If defendants could preclude antitrust judgments by litigating ancillary issues and then claiming that plaintiffs' injuries were speculative until the state supreme court passed on the other issues plaintiffs would be seriously prejudiced. As for defendants, statutes of limitations are made for their benefit and for the benefit of the courts. The procedure suggested by plaintiffs here would make the antitrust statute of limitations a non-entity. The thought that a cause of action not have a statute of limitations has been rejected by the Supreme Court as unfair. Cope v. Anderson, 331 U.S. 461, 67 S.Ct. 1340, 91 L. Ed. 1602 (1947); Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L. Ed. 743 (1946). Courts too would be burdened by the procedure plaintiffs suggest. Added complexity would be introduced into the already intricate antitrust area. And complex and lengthy proceedings are disfavored. Hanover Shoe Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L. Ed.2d 1231 (1968).

There is an attractive simplicity about plaintiffs' argument. It sounds rather logical, at the outset, that damage does not actually occur until there is no chance that it be avoided by action of the courts. But it must be remembered that courts apply *remedies*. That is,

courts make damaged parties whole. When courts act the damage has already occurred. It would be ludicrous to argue that a tort defendant did not damage a tort plaintiff until the state supreme court had passed upon the question. Yet this is what plaintiffs here seem to be arguing. Moreover, there are myriad examples in the law of situations where damages are measured from the inception of some legal procedure and not from its termination. The damage to a shareholder by a liquidation is measured from the onset of the liquidation, and not from the point at which the liquidation is beyond attack in the courts. *Cf.* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969). The forfeiture of a lease may be the subject of future litigation, yet the Eighth Circuit has allowed evidence of the value of the lease at the time of the forfeiture. United Mine Workers of America v. Coronado Coal Co., 258 F.2d 829 (8th Cir. 1919). The forfeiture in that case was, like the foreclosure in this case, simply the unilateral taking of control of the property by one party from the other pursuant to an agreement. Perhaps the best example of a situation where damage occurs when legal action is commenced, not terminated, is eminent domain. In Davis v. George B. Newton Coal Co., 267 U.S. 292, 45 S.Ct. 305, 69 L.Ed. 617 (1925), the Court made it clear that the time of the taking was the crucial time for valuation. 267 U.S. at 301. That Court did not consider the landowner uninjured until the issue had been litigated, or until he had completely exhausted his opportunities to prevent the taking. The conclusion from these types of proceedings is that plaintiffs' assertion that damage does not occur until all chance to *repair* the damage has passed is untenable.

The only caveat on proving the extent of damages which is rigorously adhered to in antitrust cases is that the finding not be based on "guesswork alone." Siegfried v. Kansas City Star Co., 268 F.2d 1, 7 (8th Cir. 1962); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Central Coal & Coke Co. v. Hartman, 111 F. 96 (8th Cir. 1901); Clapper v. Original Tractor Cab Co., 270 F.2d 616 (7th Cir.) cert. denied 361 U.S. 967, 80 S.Ct. 592, 4 L.Ed. 547 (1960); Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir.) cert. denied 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); Fireside Marshmallow Co. v. Frank Quinlan Const. Co., 213 F.2d 16 (8th Cir. 1954).

This court must conclude that, on September 9, 1967, had plaintiffs claimed that defendants' actions in violation of the antitrust laws had caused them to lose their interest in the Monona Shores property, plaintiffs would have been able to present a strong enough case to go to a jury and so that the jury's finding would not be based on mere guesswork or speculation. Accordingly, the statute of limitations has lapsed on plaintiffs' antitrust claim and its prosecution is barred.

This is not to say that the court approves or condones the conduct of United States Steel Corporation which, if as alleged by plaintiffs, certainly would point to an antitrust violation. All claims must be asserted timely, however. The particular claim here was not and so is barred.